## JENNINGS *et al.* v. TODD, *Trustee, et al., Appellants.*

### Division One, November 27, 1893.

1. **Notice:** KNOWLEDGE OF FACTS PUTTING ONE ON INQUIRY. Ordinarily one will be charged with notice of a fact who possesses information which puts him on inquiry and which if followed up with diligence and understanding will lead to the ascertainment of the truth.

2. ———: ———: COMMERCIAL PAPER. The foregoing rule, however, does not apply to negotiable commercial paper in the hands of a *bona fide* purchaser for value before maturity for actual notice of the facts impeaching its validity must be brought home to him to avoid it in his hands.

3. **Contract:** DIFFERENT DOCUMENTS: CONSTRUCTION. Ordinarily all documents made at the same time and relating to the same transaction should be read and construed together

4. ———: NEGOTIABLE NOTE: COLLATERAL AGREEMENT: INDORSEE. A collateral, contemporaneous agreement, however, providing that a negotiable note shall not be paid if an executory contract forming the consideration of the note is not performed will not affect the validity of the note in the hands of an indorsee though he have notice of the agreement.

5. ———: ———: ———: ———. Where, however, the breach of the executory agreement had occurred to the knowledge of the indorsee before he purchased the note he would not be protected.

6. ———: ———: ———: ———: ESTOPPEL. The fact that the maker told the indorsee when the latter was about to purchase the note that "he supposed he would as soon he would have it as anybody else" did not estop the maker from setting up the invalidity of the note if at the time of such statement there had been no breach of the executory contract and the maker had no reason to expect it.

7. ———: ———: ———: ———: PURCHASER NON MALA FIDES. The facts in this case reviewed and *held* that they do not show that the defendant was a purchaser in bad faith.

*Appeal from Boone Circuit Court.*—Hon. John A. Hockaday, Judge.

Reversed and remanded.

*Samuel C. Major* and *W. C. Todd* for appellants.

(1) A negotiable note is a courier without luggage, whose countenance is its passport. *Keck v. Brewing Co.*, 22 Mo. App. 187, and authorities there cited. (2) Even if Bush knew that Jennings had a contract with Chase that if his company did not supply the books when called for, his note was to be void, this could not affect Bush's legal right to a verdict in this case. For it is well settled by principle and weight of authority, that mere notice of facts such as would put a prudent person upon inquiry, is not sufficient to impeach the title of the holder of negotiable paper taken for value before maturity, his right to recover can only be defeated by proof of circumstances that show his conduct in taking it was fraudulent. *Hamilton v. Marks*, 63 Mo. 167; *Johnson v. McMurry*, 72 Mo. 278; *Mayes v. Robinson*, 93 Mo. 114; *Miller v. Ottaway*, 45 N. W. Rep. (Mich.) 665; *Rice v. Van Ackere*, 22 Ill. App. 588. (3) This evidence of plaintiff himself showing Bush to have been a *bona fide* purchaser before maturity, a verdict for Bush should have been rendered. *Bank v. Keen*, 101 Mo. 683. (4) Jennings is clearly estopped from denying the right of Bush to recover in this case. *Rice v. Brown*, 49 Mo. 231; *Conrad v. Fisher*, 37 Mo. App. 352, and cases cited; *Guffey v. O'Reily*, 88 Mo. 418. (5) It is a rule of law that when one of two innocent men must sustain a loss caused by a third person, he who has enabled that person to commit the wrong must bear the loss. *Neuhoff v. O'Reilly*, 93 Mo. 164; *Rice v. Groffman*, 56

Mo. 434; *McNeil v. Bank*, 46 N. Y. 329; *Combes v. Chandler*, 33 Ohio St. 178; *Woods' Appeal*, 92 Pa. St. 379. (6) Fraud must be proven not conjectured. *Priest v. Way*, 87 Mo. 16. Fraud may be proven by circumstances, but mere suspicion will not avail. *Crow v. Anderson*, 24 Mo. App. 159. Where on a charge of fraud the evidence is as consistent with honesty as dishonesty, it will be construed in favor of the former. And in case of doubt as to construction in such a case, the doubt should be resolved in favor of honesty. *Webb v. Darby*, 94 Mo. 621; *Shinnebarger v. Shelton*, 41 Mo. App. 147.

*Gordon, Gordon & Bass* for respondents.

(1) If Bush had actual knowledge that the note originated in fraud or was fraudulently put in circulation or that its delivery was in question because of the nondelivery of the books, then Bush is not an innocent purchaser and cannot claim protection as such. *Hamilton v. Marks*, 63 Mo. 167; *Johnson v. McMurry*, 72 Mo. 278; *Cass Co. v. Green*, 66 Mo. 511; *Edwards v. Thomas*, 66 Mo. 486; *Mayes v. Robinson*, 93 Mo. 122; *Henry v. Sneed*, 99 Mo. 423. (2) If Bush and Jennings had equal means of knowledge of the above facts, then there can be no equitable estoppel in the case. "In other words, estoppel is a plea that is born of, and must be nourished by, equity, and he that asks equity must do equity." *Rice v. Bunce*, 49 Mo. 235; 1 Daniel on Negotiable Instruments [3 Ed.] p. 823, sec. 861; Tiedeman on Commercial Paper, p. 488, sec. 288; *Watson v. Hoag*, 40 Iowa, 143; *Sackett v. Keller*, 22 Ohio St. 554; *Plant v. Jerome*, 2 Blatchf. C. C. 186. (3) The evidence shows actual knowledge on Bush's part. (4) *Mala fides*, like fraud, its congener, is not required to be proven by direct evidence alone, but

may be proven by indirect or circumstantial evidence, and, when proven, opens the door of inquiry, as to want or failure of consideration, in whole or in part, and courts are not allowed to shut their eyes to natural and rational inferences, clearly deducible from facts proven.  *Edwards v. Thomas,* 66 Mo. 468; *Mayes v. Robinson,* 93 Mo. 122; *Johnson v. McMurry,* 72 Mo. 278; *Hamilton v. Marks,* 63 Mo. 167; *Mfg. Co. v. Dickson,* 70 Mo. 273.

MACFARLANE J.—This is a suit in equity to restrain defendant Todd as trustee from selling under a deed of trust certain real estate belonging to plaintiffs and to cancel a note made by them to Potter, Chase & Co. or order and held by defendant Bush as assignee.

The petition charges, in substance, that on the twenty-third day of October, 1888, plaintiff James I. Jennings entered into a contract in writing with Potter, Chase & Co. through C. J. Chase, a member of the firm, by which the said company appointed him agent to control and manage the sale of an illustrated edition of the New Testament, and they agreed to furnish him five hundred books as they might be called for at Kansas City, at one dollar each, and reciting that he had given his note for $500, or one dollar each on said books. In consideration for the purchase of said books on said day plaintiffs executed and delivered to said C. J. Chase, their negotiable promissory note for $500, payable to said Potter, Chase & Co. eighteen months after date with eight per cent. interest from date. To secure which they gave a deed of trust on their said estate with defendant Todd as trustee; that by the terms of said contract the note was not to be paid and should be void if the company did not fulfill every requirement of the contract. The petition charges further that said company did not perform and fulfill

the contract in any particular, but wholly refused to supply the books as needed and demanded by plaintiff; that plaintiff was induced to make the contract by false and fradulent representations and that defendant Bush purchased said note with full knowledge and notice of the fradulent means by which it was procured and of the stipulation in the contract by which the note might become void.

The answer of defendant Bush was, *first*, in substance, a general denial; *second*, a plea of estoppel; and *third*, that he was an innocent purchaser of the note. In the plea of estoppel it was charged that said defendant "purchased said note at the special instance, solicitation and request of plaintiff, who told him he wished he would trade for it, that if he would he would consider him an innocent purchaser, and that relying upon these representations to him by plaintiff he purchased said note." Said defendant further answered that he was the purchaser of said note before maturity in good faith for value and without notice of any infirmity.

The evidence leaves no doubt that the scheme into which plaintiffs were lead by C. J. Chase was a gross fraud and swindle which was also worked on others, as was incidentally shown. It is unnecessary to set out the contract in full; it is not at all intelligible, but was doubtless made clear and very beneficial by the representations of Chase. It contained the following clause: "He having settled for one outfit and book, also by note for five hundred dollars, the same being payment of one dollar ($1.) each for five hundred books, which he has this day purchased, leaving a balance due of one dollar ($1) on each book, when ordered or delivered, from time to time in such quantities as the said James I. Jennings may desire." On the back of the contract was the following indorsement:

"Centralia, Mo., Oct. 23, 1888.

"The company hereby agrees that the note corresponding to the within contract shall be null and void whenever the company does not fulfill every point of the contract as signed.

"[Signed]     C. J. Chase,
       "For Potter, Chase & Co."

The contract furnishes sufficient evidence that the books were to be shipped to Jennings from KansasCity whenever ordered, and that they were never furnished though often ordered by Jennings was undisputed.

Plaintiffs testified that Chase promised not to assign the note. It appeared, however, from the evidence, that soon after its execution, he indorsed and delivered it to Gahan Bros. as collateral security for a note made by Chase to them, who afterwards themselves indorsed it in blank. Without further indorsement it went into the hands of one or two other parties and finally to defendant Bush before its maturity, who paid for it near its face value. It appears at this time that neither the fraud nor breach of contract had developed.

It appears further that on the second day of October, 1888, plaintiff executed and delivered to Chase another note payable to the same company eight months after date. This note was also for books under a similar contract, but not containing the endorsement. Defendant Bush also held this note by purchase at the same time.

The only questions of fact or law for our determination on this appeal are whether defendant was a purchaser of the note in good faith and for value and whether plaintiffs by their acts, conduct and representations, are estopped to dispute its validity. The questions of fact, on both propositions, were found, by the circuit court, against the defendant. The evidence of plaintiff and defendant Bush were in direct and

irreconcilable conflict. Each was corroborated by direct evidence of witnesses and by circumstances. Plaintiff testified in the most positive terms that he read the contract and indorsement to defendant before he purchased the note and Roberts testified that he was present and heard them read, and there were other corroborating circumstances. On the other hand defendant testified that he had no recollection of plaintiff reading either the contract or endorsement and the fact that he paid near the face value for the note is a circumstance tending to corroborate his evidence on that question.

On the question of estoppel defendant Bush testified that he purchased the notes on December 8, 1888. Before he bought them he went to Mr. Jennings and told him that the notes had been offered him. "When I asked him should I trade for the note, he said 'yes, I wish you would.' He said, 'then they will be right here, and as soon as my family is able I will make the money and pay them off. I will be glad if you will purchase them; it will not be like that other circumstance. I will consider you an innocent purchaser.' I bought them on his representation. I had no knowledge of the existence of any such paper as Mr. Jennings had." Wm. Walker testified that he afterwards heard Jennings say that he considered defendant an innocent purchaser. On this question plaintiff himself testified: "Mr. Bush talked to me about the purchase of the notes. I told him if anybody was to get them I would as soon have him purchase them as anybody."

The evidence shows that defendant Bush purchased the note and it was delivered to him on the fifteenth day of December, 1888, and the contract and indorsement were read to him on the thirteenth of that month, and it was prior to this date that defendant had asked plaintiff about buying the note. At the time of these

transactions plaintiff had made no order for books under this contract.

The following facts may be taken as established by the evidence: *First*. Defendant Bush purchased the note for value before maturity. *Second*. That he was aware of the terms of the contract and the indorsement when he purchased. *Third*. That plaintiff encouraged defendant to purchase the note.

The court found for plaintiff, and granted the relief sought; and defendant appealed.

I. That defendant Bush purchased the note for value before maturity is not questioned, either under the pleadings or evidence. The good faith of the transaction is the only subject of inquiry on this branch of the case. Defendant insists that, though the contract may have been fraudulent in its inception, and he may have been aware of the questionable methods under which Chase conducted his business, and of the suspicious circumstances under which the contract in question was obtained, and that he also had knowledge of the contemporaneous written agreement, yet, neither one nor all of these facts together relieved the note of its negotiability; that nothing short of actual knowledge of the fraud or that there had been a breach of the contract before the note came into his hands could defeat his right to enforce his security against the land.

In general one will be charged with notice of a fact who has information which should put him upon inquiry, if, by following up such information, with diligence and understanding, the truth could have been ascertained. It is now well settled in this state, however, that the doctrine of notice, as it affects the good faith of transactions generally does not apply to negotiable commercial paper. "Both upon principle and authority," says WAGNER, J., "and from the experience of jurists and commercial men, and the interests

of the affairs of business life, it is safe to say that the liberal doctrine which promotes the free circulation of negotiable instruments, is the best, and that the good faith of the transaction should be the decisive test of the holder's rights." *Hamilton v. Marks*, 63 Mo. 178. Since the decision in that case it has been settled law in this state "that the consideration of negotiable paper in the hands of a *bona fide* holder for value before maturity cannot be inquired into. *Mala fides* alone can open the door to such inquiry. Gross negligence, even, is not sufficient; actual notice of the facts which impeach the validity of the note must be brought home to the holder." *Mayes v. Robinson*, 93 Mo. 122.

II. The next inquiry is, were the rights of defendant as indorsee of the note affected by knowledge of the transaction which was the consideration of the note and of the indorsement on the back of the contract. The contract, indorsement and note have the same date, and, as the evidence shows, were made at the same time. According to the general rule of construction, in general business matters, these being all made at the same time, and relating to the same transaction should be read and construed together; but should that rule be applied when one of the instruments is a negotiable security? It is said that the rule may be applied to the construction of a contemporaneous written contract affecting the terms of negotiable paper, "in so far as each may be given effect, and there is no repugnancy between them." 1 Daniel on Negotiable Instruments [4 Ed.], sec. 156. The rule is frequently applied to collateral agreements for renewals, for the payment of an additional sum upon a contingency for the same consideration, and fixing a time for payment of note or interest. 1 Daniel on Negotiable Instruments, *supra*. An indorsee with notice will be

bound by such agreements.   They are not repugnant to the negotiable character of the note.

We think, however, that no well considered case can be found in which a collateral contemporaneous agreement providing that the note should not be paid in the event that an executory contract, which was the consideration of the note, should not be performed, has been allowed to defeat the negotiability of the note in the hands of an indorsee, though he had notice of such agreement.   A great part of the improvement of the country, and of business generally, is carried on with money raised by the discount of notes given upon executory contracts, and if the maker could be allowed to defend against such notes, in case of a breach of contract, on the ground that the indorsee, though in other respects *bona fide*, had knowledge of the transaction out of which the note grew, all confidence in such notes as negotiable paper would be destroyed and such business would be paralyzed.   By making and delivering a negotiable note, the maker is held to intend that it may be put in circulation and that no defenses against it exist.   In purchasing such note no inquiry as to the consideration is required.   If a failure of consideration occur, the maker must look to the payee for indemnity.

On this subject Parsons, in his work on Notes and Bills (Vol. 1, p. 261), says: "Knowledge on the part of the holder, at the time he took the note, that it was not to be paid on a specified contingency, is not sufficient to defeat his right to recover, although the contingency had then happened, if he was ignorant of this fact."   See, also, *Miller v. Ottaway*, 81 Mich. 196; *Adams v. Smith*, 35 Me. 324; *Kelso v. Frye*, 4 Bibb 493; *Dow v. Tuttle*, 4 Mass. 414; *Davis v. McCready*, 17 N. Y. 230; Tiedeman on Commercial Paper, sec. 42, and cases cited.

VOL. 118—20

If the breach had occurred to the knowledge of the indorsee when he purchased, he would not, of course, be protected. The settled rules of law governing commercial paper, upon the stability of which alone can the usual business of the country be transacted, cannot be disregarded in order to relieve a few unwary persons from the result of transactions into which they have been drawn by their own credulity or cupidity. Upon careful consideration, we think the contract afforded no defense to the note which was purchased before a breach occurred.

III. The next question is, whether plaintiff is estopped by his statements and conduct to dispute the validity of the note in the hands of defendant. If, at the time the representations were made, there had already been a breach of the contract, or other defenses existed, it would have been the duty of plaintiff to have spoken, and, not having done so then, he should not thereafter be allowed to deny the truth of his representations. But at the time the representations were made there had been no breach of the contract, and plaintiff, so far as appears, had no reason to suspect that one would occur. The representations can be taken, then, as referring to the existing *status* of the note and to defenses then known, and did not exclude such as might subsequently arise. 1 Daniel on Negotiable Instruments [4 Ed.], sec. 860, and the following cases cited, which fully sustain the text: *Maury v. Coleman*, 24 Ala. 382; *Cloud v. Whiting*, 88 Ala. 57; *Allen v. Frazee*, 85 Ind. 283; *Koons v. Davis*, 84 Ind. 389.

If plaintiff had made an obsolute promise to pay the note he might have precluded himself from making defenses subsequently arising. Defendant's own testimony did go so far as to claim an absolute promise. He states that, when he told plaintiff he was

about buying the notes, he replied: "I wish you would trade for them, then they will be right here, and as soon as my family gets able I will try to make the money and pay them off. I will consider you an innocent purchaser and wish you would get them." Plaintiff testified: "I told him that Mr. Chase had promised to keep the notes himself, but as he had traded them off already, I suppose I would as soon he would have them as anybody else." We think the probability is that the statement of plaintiff is nearest correct, and that there was no absolute promise to pay the note.

IV. The controlling question is, whether the defendant had notice of the fraudulent intent of Chase, or participated in accomplishing it. The fraudulent scheme of Chase was well developed by the evidence. His efforts were directed to inducing parties to enter into an agreement to manage the sale of a book in certain localities, and by pointing out the profits they could realize by purchasing a lot of books, the sale of which they could control themselves, to obtain from them negotiable notes payable in the future. He remained in the neighborhood, furnishing to the parties taking hold of the scheme books as they were sold until he had obtained all the notes he could procure. He then sold the notes, left the neighborhood, and refused to furnish books to those who had purchased. He boarded at a hotel in Centralia. Defendant Bush frequently visited him at his hotel. This he admitted. Said he went because he "liked to hear him go over his prospectus." Defendant introduced Chase to plaintiff. He hunted him up for that purpose. On the introduction he went to the hotel and was present during a part of the interview between them. For this introduction Chase paid him fifty dollars. He told a friend, who upbraided him with getting plaintiff into trouble that he had a "right to work for a commission

as much so as anybody else had in any other kind of business." Defendant testified that he told plaintiff that if he did not get the books he would not be hurt, for it was written in the contract that, in that event, the note would be null and void. "He asked me if it was written on the note and I told him that it was not; he said if that was written on the note then Mr. Chase could not trade it off." It will be observed that the fraud of Chase was not in the character of the contracts made, but in a predetermined intention, after obtaining and selling the notes, not to comply with the contract. This fact should be kept in mind in considering the good faith of Bush in the matter.

It is insisted that the evidence establishing the foregoing facts fixes upon defendant Bush the knowledge of the fraudulent intent of Chase, and we would be of that opinion if it disclosed all the facts and circumstances in the case. The fact that Chase paid Bush $50 for an introduction to Jennings, standing alone ought to be, in itself, conclusive of knowledge of, if not participation in, the intended fraud. But that fact does not stand alone. It seems from the evidence to have been well understood, in fact no secret was made of it in the neighborhood, that any person would be paid by Chase a like commission for introducing one who would enter into a contract such as plaintiff made. Jennings admitted that he was informed, before he entered into the contract, that Bush was so paid for introducing him. He himself afterwards obtained a reward for introducing a Mr. Green to Chase and admitted that he had also tried to induce others to make contracts. If we charge defendant with notice of the fraud we must also charge plaintiff with knowledge. He disclaims such knowledge. Why then should we charge knowledge upon defendant? He paid nearly the face value for the note, which is a strong

circumstance in his favor.    We should attribute to each party honesty of purpose in the absence of proof to the contrary.    It is evident, we think, from all the circumstances that both parties honestly believed, when the transfer of the note was made, that the contract would be fully performed.    We think from the evidence before us, that the defendant, at most, had a mere suspicion that the contract would not be carried out.    This, as has been seen, was not sufficient to stamp his purchase with bad faith.

The question of right between these parties is undoubtedly a close one.    The case was evidently tried by plaintiff on the theory that notice of the contract and the indorsement thereon was sufficient to charge defendant with bad faith in buying the note. ' Upon a trial of fact, by a chancellor, when the evidence is so nearly balanced, we are not disposed to disturb the result reached; but in this case, in which no specific findings were asked by counsel or made by the court, we cannot determine whether the finding was upon the question of notice or was controlled by some of the legal propositions herein discussed.    With the view we take of the law we are not satisfied with the finding.    We therefore reverse the judgment and remand the cause for a retrial, if the parties desire it.    All concur, except BARCLAY, J., who is absent.