O’NIELL, J.
In June, 1910, N. Frey, Limited, having a government contract for certain levee construction in the parish of Pointe Coupee, La., called upon the plaintiff firm in New Orleans, with a view of purchasing an equipment consisting of two locomotives and a lot of dump cars. A. Marx & Sons agreed to act as brokers, to locate a suitable equipment, and put N. Frey, Limited, into communication with th'e owner of it. The result was that, on the 15th of August, 191.0, N. Frey, Limited, purchased from the William J. Oliver Manufacturing Company, in Knoxville, Tenn., an outfit consisting of two Davenport dinkey locomotives and 20 four-yard and 24 eight-yard Oliver dump cars. The price agreed upon was $12,400, one-third of which was paid in cash, and the balance was represented by two promissory notes executed by N. Frey, Limited, for $4,-133.33 each, dated the 15th of August, 1910, and payable four months after date, to the William J. Oliver Manufacturing Company, or order, at the Mechanics’ Bank & Trust Company’s bank'in Knoxville, Tenn.
It was agreed between N. Frey, Limited, and the Oliver Manufacturing Company, in their verbal negotiations in Knoxville, that the manufacturing company would repurchase the equipment from the purchaser, when the latter’s levee contract was completed, at one-half of the price at which the engines and ears were sold, and on certain conditions.
On the 5th of August, 1910, the Oliver Manufacturing Company wrote to N. Frey, Limited, inclosing bills of lading for a part of the equipment, and also the two notes for $4,133.33 each and the act of sale containing a recognition of the vendor’s lien and mortgage on the locomotives and cars, and requested that the contract, and notes be signed by N. Frey, Limited, and returned to the Oliver Manufacturing Company.
Messrs. N. Frey, Limited, inserted the following clause in the contract of sale, and signed it and the notes and returned them to the Oliver Mianufacturing Company in a letter dated the 17th of August, 1910, calling attention to the interlineation, viz.:
“It being agreed that N. Frey, Limited, shall have the option, upon completing their present contract at Alabama Island, Pointe Coupee parish, to return any or all of the engines and cars to the vendor, at the location where they will be used, in good condition, ordinary wear and tear excepted, and receive a credit of 50% on the purchase price of same, to wit: On 20 4-yd. cars at $50 each, 24 8-yd. cars at $350 each, and 2 Davenport dinkey engines at $1,-500 each.”
The insertion of the foregoing clause in the contract of sale was not satisfactory to the Oliver Company; and a few days later the general manager of the company called on N. Frey, Limited, in New Orleans, with a letter from W. J. Oliver, dated the 23d of August, 1910, in which he explained that he wanted the negotiability of the promissory notes to be unaffected by the agreement to repurchase the outfit, and requested that the repurchase agreement be made in a separate instrument, and that negotiable notes be given. Accordingly a written contract was entered into between N. Frey, Limited, and William J. Oliver, represented by H. L. Pike, who was the general manager of the Oliver Manufacturing Company, in which it-was recited that, whereas N. Frey, Limited, had purchased the outfit above de *951 scribed from William X Oliver, the latter agreed that, within ten days from the receipt of a notice from N. Frey, Limited, that the latter desired to dispose of the 2 locomotives and the 24 eight-yard cars, he would send a representative to inspect them, and would repurchase the 2 locomotives and the 24 eight-yard cars at one-half of their cost price —that is, $1,500 and $350 each, respectively— at the expiration of approximately four 'months, provided the equipment should be in as good condition as when bought, ordinary wear and tear excepted, and provided it should be loaded on barges convenient to a standard gauge railroad. It was also agreed that, in event of a disagreement as to the condition of the outfit, arbitrators should be appointed, with the right to call in an umpire, the decision of two of them to be final, etc.
N. Frey, Limited, then signed the contract of sale, recognizing the vendor’s lien on the locomotive and dump cars, and signed the two promissory notes, dated the 15th of August, 1910, containing no reference whatever to the repurchase agreement.
A. Marx & Sons had an agreement with N. Frey, Limited, whereby the former was to receive from the latter a commission of 5 per cent, on the purchase price of the equipment, and a similar agreement with the Oliver Company,- whereby the latter also agreed to pay a commission of 5 per cent. Although, as to N. Frey, Limited, and the Oliver Company, neither knew that' the other was to pay a commission to A. Marx & Sons, their agreements with the latter were entirely legitimate, because A. Marx & Sons acted only in the capacity of a broker or intermediary. R. C. C. art. 3016; 2 Clark & Skyles, Law of Agency, p. 1689.
In the latter part of August, 1910, the Oliver Company wrote to A. Marx & Sons, requesting the latter to purchase one of the notes of $4,133.33, deduct the commission of 5 per cent, of the purchase price of the outfit from the proceeds of the note, and remit the balance. It was explained that the payment of the notes would be secured by a lien on the engines and ears, and also by the indorsement of the Oliver Company. A day or two thereafter the general manager of the Oliver Company called at the office of A. Marx & Sons, in New Orleans, and sold one of the notes of $4,133.33 to the latter, and thereafter, on the same day, sold the other note of $4,133.33 to A. Marx & Sons-at a discount of $500.
When A. Marx & Sons demanded a commission of 5 per cent., or $620, from N. Frey, Limited, the latter declined to pay it, saying that the Oliver Company had agreed to pay all commissions due to the broker. The matter was compromised on the 8th of December, 1910, by N. Frey, Limited, agreeing to pay, and A. Marx & Sons agreeing to accept in full settlement of the commission, $300; but it has not been paid.
A. Marx & Sons desired that N. Frey, Limited, should not know that they owned the notes given by the latter to the Oliver Company; the reason assigned being that, on account of their friendly relations with N. Frey, Limited, they desired to avoid having to refuse to grant an extension at the maturity of the notes, if the maker should request it. A. Marx & Sons discounted one of the notes at the Whitney-Central National Bank, in New Orleans, on the 26th of August, 1910; and, in order that N. Frey, Limited, might not learn that the note belonged to A. Marx & Sons, the latter declined to indorse the note and, in lieu of their indorsement, signed a separate document as surety. On the same day A. Marx & Sons negotiated the other note with the Com mercial-Germania Trust & Savings Bank, in New Orleans. This bank declined to discount the note without the indorsement of A. Marx & Sons, and the indorsement was obviated by A. Marx & Sons’ *953 issuing their own note with the N. Frey note attached as collateral security.
In the early part of December, 1910, N. Frey, Limited, believing that the notes were held by the Oliver Company, wrote to the latter, requesting an extension of 30 days. The Oliver Company replied, informing N. Frey, Limited, that the notes were owned by A. Marx & Sons, and at the same time sent a copy to A. Marx & Sons of the correspondence with N. Frey, Limited, regarding the request for an extension. The attorney of Á. Marx & Sons advised them that, to avoid novating the debt or affecting the security, in granting an extension, the renewal notes should be made payable to the Oliver Company, or order. A. Marx & Sons then called upon N. Frey, Limited, with the correspondence regarding the request for an extension; and on or about the 8th of December, 1910, the representatives of A Marx & Sons and of N. Frey, Limited, with their respective attorneys at law, met at the office of the attorney of N. Frey, Limited, and drew up an agreement between the William J. Oliver Manufacturing Company and N. Frey, Limited, dated the 15th of December, 1910, reciting that, whereas N. Frey, Limited, desired to extend payment of the notes due that •day to the 15th of January, 1910, therefore, in order to accomplish the extension without novating the debt and without affecting the mortgage or vendor’s lien on the locomotives and dump cars, N. Frey, Limited, executed two renewal notes due on January 15, 1911, of the same tenor as the original notes, payable to the William J. Oliver Manufacturing Company, or order. This agreement, with the two renewal notes, was sent to the Oliver Company, who signed the act and indorsed the renewal notes, and forwarded them to A. Marx & Sons.
Although N. Frey, Limited, was informed by the Oliver Company that the notes were ■owned by A. Marx & Sons when the maker requested an extension, A. Marx & Sons pretended, when the extension agreement was drawn up, that the notes were yet owned by the Oliver Company.
On the 3d of January, 1911, N. Frey, Limited, sent a telegram to the William J. Oliver Manufacturing Company, tendering to the latter the locomotives and cars in accordance with the agreement to repurchase them. Four days later N. Frey, Limited, wrote to the Oliver Company, requesting a response to the telegram; and on the 19th of January the attorney of N. Frey, Limited, sent another request by registered letter, saying that the notes would not be paid unless the repurchase agreement should be immediately carried out. To this the Oliver Manufacturing Company replied on the 23d of January, 1911, saying that Mr. Oliver had sent his master mechanic to inspect the equipment, and that he had found it still in use and very much damaged. In this letter the Oliver Company said:
“As you are -perhaps aware, the sale of this equipment by the Wm. J. Oliver Manufacturing Company and payment for it by notes due them, and the proposed purchase by W. J. Oliver, were entirely separate transactions; the repurchase agreement in no way contingent upon the other transaction. You are also aware that the notes of N. Frey, Limited, were sold to A. Marx & Sons, who very kindly arranged for an extension for your clients.”
The attorney of N. Frey, Limited, replied on the 25th of January, saying that the Oliver Company’s dealings were fraudulent, and that N. Frey, Limited, would contest the payment of the notes on that ground; to which the Oliver Company replied on the 1st of February, saying that the company had no contract with N. Frey, Limited, for the repurchase of the equipment, the contract having been made between W. J. Oliver and N. Frey, Limited.
In this suit on the two notes dated the 15th of December, 1910, the plaintiffs, A. Mark & Sons, alleged merely that they were the owners of the notes which were given *955 by N. Prey, Limited, in renewal oí the two notes dated the 15th of August, 1910, and acquired by the plaintiffs from the Oliver Manufacturing Company for value before maturity; and they prayed only for an ordinary judgment on the notes.
In answer to the suit N. Prey, Limited, denied that the plaintiffs had acquired the notes in good faith or before maturity, and alleged that the plaintiffs had knowledge of the agreement between the defendant and the Oliver Company. The defendant alleged that the plaintiffs were not in reality the owners of the notes; that they had been transferred to them fraudulently and for the sole purpose of defeating the defendant’s right to compel the Oliver Company to repurchase the equipment in part payment of the notes; that the plaintiffs acted as the agents of the Oliver Company in the sale of the locomotives and dump cars. The defendant recited the facts stated above regarding their inserting the repurchase agreement in the act of sale before signing and returning it to tie Oliver Manufacturing Company, and alleged that, at the request of the Oliver Company, the repurchase agreement was not embodied in the act of sale nor in the notes, but was made in a separate instrument, in order that the Oliver Manufacturing Company might negotiate the notes or use them at the bank. It is alleged that the making of the repurchase agreement with.W. J. Oliver, instead of the William J. Oliver Manufacturing Company, was a typographical error. It is alleged that the locomotives and cars are in good condition and have been tendered to the Oliver Company, and that defendant should have credit on the notes for one-half of the purchase price of the equipment— that is, $6,200 — leaving an indebtedness of only $2,006.66. The defendant concludes with the plea that the plaintiff is only the agent of the Oliver Company in this suit, and, in the alternative, if it be not proved that the plaintiff is representing the Oliver Company in the prosecution of this suit, then, that the plaintiff firm was aware of the repurchase agreement between the defendant, and the Oliver Company before the notes, were acquired, and is in no better situation than the Oliver Conmanv would be as plaintiff in this suit.
Judgment was rendered ,in favor of the plaintiffs for $8,266.66, subject to a credit of $5,700, being one-half of the cost price of' the two locomotives and the 24 eight-yard cars, allowing 6 per cent, interest on the $8,-266.66 from the 15th of December, 1910, to the 13th of January, 1911, “the date when the plaintiffs or their assignor' should have taken back said cars and locomotives,” and on $2,566.66 from that date until payment of the judgment; and it was ordered that the plaintiffs take back the 2 locomotives and 24 eight-yard cars “tendered by the defendant in accordance with the contract.” The plaintiffs have prosecuted this appeal.
Opinion.
It was proved conclusively on the trial" of -this case that the plaintiff purchased the original notes dated the 15th of August, 1910, for the consideration stated above in August, 1910. A member of the defendant company testified that on his return from Knoxville-before the notes were signed he told one of the members of .the plaintiff firm that the Oliver Manufacturing Company had agreed, to take back the equipment at half price. He is corroborated by the testimony of the machinist who inspected the equipment for the N. Frey Company. The testimony of' these two witnesses is denied emphatically by the member of the plaintiff firm referred to. In our view of the case, this conflict in the-testimony is of no importance, as will .be-explained hereafter.
There is no doubt that A. Marx & Sons-learned that there was an agreement regard *957 ing the repurchase of this equipment, or a portion of it, when N. Frey, limited, requested an extension of payment of the original notes. It does not appear, however, that A. Marx & Sons read the agreement, or knew whether it was made with William J. Oliver or the Oliver Manufacturing Company, or knew any of the details of the agreement.
Whether the repurchase agreement was made with William J. Oliver intentionally, or the writing of his name instead of that of the Oliver Manufacturing Company was an error, as alleged in the defendant’s answer, is not made clear; but that question is also not important in the decision of this case.
It was not contemplated in the agreement to repurchase the 2 locomotives and 24 eight-yard dump cars, expressly nor by implication, that the purchase price should be credited on the notes, or that the notes should not be paid in full at maturity. On the contrary, the defendant admits in its answer to this suit that the repurchase agreement was made in a separate instrument in order that it should not affect the negotiability of the notes, and in order that the Oliver Manufacturing Company might negotiate them or use them at the bank. N. Frey, Limited, intentionally assumed the position of having to pay the notes at maturity, and relied upon the obligation of the Oliver Manufacturing Company or of William J. Oliver individually to repurchase the 2 locomotives and 24 eight-yard cars at the completion of the levee work for which the equipment was bought.
Under these circumstances, there was no fraud -or imposition in A. Marx & Sons’ failing to inform N. Frey, Limited, that they owned the original notes when the renewal notes were made. That information would have been of no value to N. Frey, Limited, who had arranged the repurchase agreement so that it could not affect the negotiability of the notes, for the express purpose of enabling the Oliver Company to negotiate them.
The judgment rendered in this case, ordering the plaintiffs to take the 2 locomotives, and 24 eight-yard dump cars, and crediting their value, $5,700, on the notes sued on, rests upon the wrong theory that the defendant’s obligation to pay the notes was subject to a counter obligation of the payee to repurchase the property and that the latter obligation went with the notes to their transferee.
[1, 2] The law does not provide that one-who purchases a promissory note, having knowledge of a separate obligation on the part of the transferror to the maker of the note, must assume that obligation.
As was said in Sadler v. White, 14 La. Ann. 177:
“If the consideration of the note had not failed at the time of its transfer, the maker cannot set up as a defense that the holder knew that there might be offsets against it.”
The doctrine above quoted was affirmed in State Nat. Bank v. Cason, 39 La. Ann. 865, 2 South. 881, where it was said:
“If it were known to the transferee of a negotiable promissory note, acquired for value and before maturity, on taking_ it, that the consideration was future and contingent, and that there might be offsets against it, this would not make him liable for the equities between the original parties. * * *
“It cannot affect the negotiability of a note that its consideration is to be thereafter realized, or that from some contingency it may never be enjoyed.”
In Jennings v. Todd, 118 Mo. 296, 24 S. W. 148, 40 Am. St. Rep. 373, it was said:
“A collateral contemporaneous agreement providing that the note shall not be paid if an executory contract forming the consideration of the note is not performed will not affect the validity of the note in the hands of an indorsee taking it with notice of the agreement, if without knowledge of a breach thereof. * * *
“If the breach had occurred to the knowledge-of the indorsee when he purchased, he would not, of course, be protected. The settled rules of law governing commercial paper, upon the-stability of which alone can the usual business of the country be transacted, cannot be disregarded in order to relieve a few unwary persons from the result of transactions into which they have been drawn by their own credulity.”'
*959 Parsons on Bills and Notes, vol. 1, p. 261, lays down the doctrine:
“Knowledge on the part of the holder at the time he took the note that it was not to be paid on a specified contingency is not sufficient to defeat his right to recover, although the contingency had then happened, if he was ignorant of this fact.”
That doctrine goes further than necessary to destroy the defense in this case. The collateral agreement between the maker and the payee of the notes did not provide that the locomotives and cars, the purchase price of which was represented by these notes, should be repurchased in satisfaction or part satisfaction of the notes. On the contrary, the collateral agreement was such that it could not affect or impair the negotiability of the notes.
The judgment appealed from is annulled and set aside, and it is adjudged and decreed that the plaintiffs recover of and from the defendant the sum of $8,266.66, with interest thereon at 6 per cent, per annum from the 15th of December, 1910, and 10 per cent, attorney’s fees, $5 protest fees, and all costs ■of this suit.