Samuel E. HOLT and Frances-Jean P. Holt, (Plaintiffs) Appellants,

v.

QUEEN CITY LOAN & INVESTMENT, INC., (Defendant) Respondent.

No. 50132.

Supreme Court of Missouri,

Division No. 1.

April 13, 1964.

394

Samuel E. and Frances-Jean P. Holt, pro se.

Sam F. Hamra, Jr., James K. Prewitt, Miller, Fairman, Sanford, Carr & Lowther, Springfield, for respondent.

HOLMAN, Judge.

In this equitable action plaintiffs sought a decree whereby they would recover certain notes transferred by them, and also a judgment for damages in the sum of $20,000. The controversy grew out of a transaction wherein plaintiffs. agreed to purchase certain improved real estate located in Springfield, Missouri, from Dr. Kenneth Berg. They now contend that Berg made false and fraudulent representations in regard to certain phases of the transaction for which defendant is legally responsible. Defendant, Queen City Loan & Investment, Inc., filed a counterclaim seeking a judgment for payments collected by plaintiffs upon a note alleged to have been owned by it, and for other relief. The trial court found for defendant on plaintiffs' petition and also on its counterclaim. Plaintiffs have appealed from the ensuing judgment.

■ Plaintiffs have filed a pro se brief in this court. Defendant has filed a motion to dismiss the appeal based upon the failure of plaintiffs' brief to comply with Civil Rule 83.05, V.A.M.R. While said brief is deficient in some respects we have decided that we will not impose the drastic penalty sought and the motion is accordingly overruled.

Plaintiffs were the owners of the Sheridan Hills Motel in Tulsa, Oklahoma. Early in June 1960 they sold that motel and as a part of that transaction received certain notes upon which was due a total of approximately $100,000. At about that time plaintiffs were contacted by two real estate agents who represented Dr. Berg of Springfield, Missouri. As a culmination of negotiations with Berg plaintiffs entered into a contract whereby it was agreed that Berg would construct two 12-unit apartment buildings in the outskirts of Springfield, Missouri, and, upon their completion he would convey them to plaintiffs, subject to a $75,000 mortgage which would be placed on each apartment building. Plaintiffs were also to receive the equity in a certain residence located in Springfield. In consideration for these properties plaintiffs agreed to place in escrow with the Citizens Bank of Springfield, the following: (1) $2,000 in cash; (2) a note in the sum of $52,000 signed by Rachel Clifton and Paul C. Vaught, payable to plaintiffs and secured by a fourth mortgage on the aforementioned motel; (3) a note in the sum of $8,500 signed by Rachel Clifton and Paul Vaught, payable to plaintiffs, which was also secured by the fourth mortgage mentioned in (2) above; and (4) a note signed by Eddie Clifton, payable to Rachel Clifton and assigned to plaintiffs, on which there was a balance due of approximately $31,500. This note was secured by certain shares of stock and by policies of life insurance. As part of the same transaction a deed, executed by Dr. Berg and his wife conveying to plaintiffs the lots upon which the apartment buildings were to be constructed, was deposited in escrow with the Citizens Bank. Under the escrow agreement the money and notes deposited by plaintiffs were to be delivered to Dr. Berg, and the aforementioned deed was to be delivered to plaintiffs upon the culmination of the real estate sales contract which had been entered into by said parties.

Dr. Berg began the construction of the two apartment buildings in June of 1960. For the purposes of this opinion these structures will be referred to as the "east apartment" and the "west apartment." There were two other apartment buildings being constructed by Dr. Berg which were located between the two buildings plaintiffs had agreed to purchase. The residence property plaintiffs were to receive was conveyed to them and they were residing there at the time of trial. It was conveyed subject to a deed of trust upon which was due approximately $12,000. In the fall of 1960 plaintiff (we hereinafter refer to Samuel E. Holt as plaintiff) indicated to Berg that he was dissatisfied with the interior finishing of the east apartment and as a result of that complaint it was agreed that plaintiff would supervise the interior finishing of that building. Plaintiff was involved in that work for at least 30 days. Dr. Berg was successful in obtaining a $75,000 loan on each of the apartment buildings from Phoenix Mutual Life Insurance Company, the loan on the east apartment being disbursed on September 26, 1960, and the one on the west apartment being disbursed on October 26, 1960.

Early on the morning of October 31, 1960, Dr. Berg called plaintiff and requested that he meet him at the Colonial Hotel for a conference in regard to the apartment projects. In that conference Dr. Berg told plaintiff that the east apartment had been completed and the west apartment was substantially completed and asked him if he would supervise the finishing of that building. Plaintiff agreed to do so and Berg gave him a check for $5,000 to guarantee payment of the expenses of completing work on that apartment. Dr. Berg at that time asked plaintiff to authorize the

delivery of the securities held in escrow by the Citizens Bank, it being then agreed that they would make a joint inspection of the apartment buildings immediately after the securities were transferred. In compliance with Dr. Berg's request plaintiff went with him to the Citizens Bank and they obtained the release of the items in escrow, and plaintiff went home and brought his wife to the office of defendant where they signed all the papers necessary to transfer ownership of the securities to Dr. Berg. After taking his wife home plaintiff returned to the office of defendant to meet Dr. Berg and make the inspection of the apartment buildings, but was told that Dr. Berg was busy and that they would have to make the inspection later. Accompanied by William Gabler, the general manager of defendant, plaintiff and Dr. Berg inspected the apartment buildings on November 4. Plaintiff testified that upon inspection of the west apartment he found many matters of a minor nature that were unsatisfactory and, with the help of Mr. Gabler, he discovered a major defect, viz., a large crack in the foundation; that upon discovering the condition of the west apartment he stated that he would not accept the building and demanded the return of the notes he had assigned on October 31; that Dr. Berg then told him he had assigned them to the defendant immediately after they had been assigned to him and that he therefore could not return them.

After an extended period of negotiation it was agreed between Dr. Berg and plaintiffs that plaintiffs would accept the east apartment building, and that in lieu of the west apartment Dr. Berg would transfer to plaintiffs certain shares of stock which were to have an agreed value of $46,000 and a note for $4,000. Plaintiffs, as a result of this agreement, did receive 13,000 shares of stock in Commonwealth Loan & Investment Company. Apparently, those were represented to have a value of $2 per share, although there was evidence to indicate that they were later found to be worth less than that amount. Other shares

of stock which Dr. Berg had agreed to deliver to plaintiffs were apparently not delivered; however, there is some evidence that he tendered 14,000 shares of stock in the defendant company but that those shares were not accepted because of a dispute or misunderstanding as to whether plaintiffs should receive voting or nonvoting stock. Plaintiff also testified that after he began the operation of the east apartment building it was discovered that the septic tank was inadequate and that he was required to spend $2,000 to correct the defect in that regard.

Plaintiffs' petition was in three counts. Count I sought a recovery against defendant upon the theory that Dr. Berg was the agent of defendant in regard to the matters relating to the sale of the aforementioned apartment buildings. The theory of Count II was that defendant had knowledge of the defect in Dr. Berg's title to the notes and hence was not a holder in due course. In Count III it was alleged that Dr. Berg and defendant were engaged in a joint adventure in regard to the transaction in question. The relief sought in each count was the same, i. e. (1) that the endorsement and assignments of the promissory notes to Dr. Berg and to the defendant be cancelled and declared invalid; (2) that plaintiffs be declared to be the owners of said notes; (3) that plaintiffs recover all payments made to defendant on said promissory notes; and (4) that plaintiffs recover damages from the defendant in the sum of $20,000. In their pleadings and testimony plaintiffs offered to comply with any requirements made by the court in order that equity be accomplished.

Defendant filed a counterclaim in three counts. The first count was dismissed before trial. In the second count defendant sought to recover from plaintiffs $8,000 which it alleged they had collected on a note theretofore assigned to defendant. In count three defendant sought a declaratory judgment to the effect that it was the sole owner of the notes that Dr. Berg had as-

signed to it and that plaintiffs had no right, title, or claim thereto.

The evidence upon which plaintiffs relied in an effort to prove agency and joint adventure between Dr. Berg and the defendant, as well as notice of the fraud involved, will now be stated. Dr. Berg was referred to in the evidence as being a major stockholder of the defendant corporation. Plaintiff testified that from June until September 1960 he often met Dr. Berg at defendant's office; that during that period he would call Dr. Berg at defendant's office and if he was not there would leave word for him to return the call; that during that time Dr. Berg had no other office except the use he was making of defendant's office; that in September 1960 Dr. Berg opened his own office at a location next door to the office of defendant. On cross-examination, however, plaintiff stated that no one at the office of defendant ever told him that Dr. Berg was an officer, director, or employee of the defendant.

Mrs. Betty Chase, an employee in the office of defendant, testified that William Gabler was general manager of the defendant company from June 1960 until April 1961; that the records of the defendant show that defendant purchased the notes (which were in escrow at that time) from Dr. Berg on July 19, 1960; that at that time loans which defendant had made to Dr. Berg in the amount of $15,000, $9,-495, and $8,300 were cancelled; that a certificate was issued to Dr. Berg for 12,519 shares of "B" stock in defendant corporation at a value of $3 per share, or a total value of $37,557; that the value of the stock and the amount of loans cancelled totalled $70,352, which amount defendant's records showed was the consideration paid for the assets received from Dr. Berg, and which amounted to a discount of 26.3% upon the face value of said assets; that Dr. Berg's notes were not marked paid by defendant until October 31, 1960.

Donald Heizelman testified that he was foreman for Dr. Berg on the apartment buildings project from May 1960 until October 20, 1960; that William Gabler would come out once or twice a week and look at the apartments, often accompanied by Dr. Berg; that if Dr. Berg was not available Gabler would sometimes make minor decisions concerning the project, although all important final decisions were made by Dr. Berg; that about the middle of September Dr. Berg and Gabler told him of the crack in the foundation of the west apartment and Gabler said that if plaintiff saw the crack he would "back out" of the deal; that he did not tell plaintiff about this crack. He stated that the arrangement he had with Dr. Berg was that he would pay the bills for labor and material out of his personal bank account and Dr. Berg would give him a check from time to time to cover the amounts he had paid out; that on several occasions Dr. Berg left signed checks with Mr. Gabler and Gabler would fill out the check for an amount sufficient to cover the "bills which I needed to pay, and deliver the same to me." On cross-examination this witness stated that Dr. Berg never represented to him that he was an agent, employee, or director of the defendant corporation.

William Gabler was called as a witness for the defendant and stated that Dr. Berg came to the office of defendant in July 1960 and talked with him and with Mr. Gatlin (another officer of defendant company) about selling the notes in escrow to the defendant; that he went to the Citizens Bank with Dr. Berg and examined the documents in question; that an arrangement was then worked out whereby, if Dr. Berg fulfilled his agreement with plaintiffs and obtained the documents that were in escrow, defendant would purchase same; that the consideration was to be the cancellation of certain loans Dr. Berg had with the defendant and an additional amount of stock in the defendant company. He stated that the first time he saw the crack in the west apartment building was during the early part of November; that after plaintiffs refused to accept the west apartment it was purchased

from Dr. Berg by Commonwealth Loan & Investment, Inc., which company he also represented; that the crack was repaired at a cost of $2,700; that he never filled out any checks for Dr. Berg but that it was entirely possible that Dr. Berg had left one or more checks at the office for foreman Heizelman to pick up.

Defendant also presented Frank Brewster and Robert Killian, both of whom were directors of the defendant, and each of these witnesses testified that Dr. Berg was not an officer, director, or employee of the defendant during the period here involved. Dr. Berg was not a defendant in this action and did not testify. Apparently, he left Springfield before the trial of this case.

In regard to the issues raised in the second count of defendant's counterclaim plaintiff testified that he continued to receive the payment of $500 per month on the Eddie Clifton note after October 31, 1960, until November 1951, and also received an additional payment of $1,071.25 in April 1961, but that he paid $750 of the amount collected to Dr. Berg.

The findings and decree of the trial court included the following:

"The first issue to be decided by the court is whether or not this defendant is a holder in due course of the notes in question. If the defendant is such a holder, all of the many other issues raised in this case have no bearing on the final judgment.

"The court finds that on the date these securities were endorsed over to this corporate defendant, the defendant became a holder in due course for value. * * *

"There is no evidence that the officers and agents of the defendant corporation would have any reason to believe or suspect that the plaintiff, who was in actual charge of the completion of the apartment houses, was being, or could be, defrauded as to their condition. It is true that the defendant company did not give face value for these securities, but securities of this nature (a fourth mortgage) are commonly discounted quite heavily. * * *

"It seems obvious that the transaction of July 19, 1960, between the defendant corporation and Dr. Berg was a conditional sale of the securities in question. * * * On October 31, 1960, the conditional contract was completed by the physical delivery and endorsement of the securities to the defendant, and Dr. Berg received the stock in defendant corporation.

"On Count II of defendant's counterclaim, the court finds that the plaintiffs have received all the payments on the Eddie Clifton note, even though defendant has been the legal owner of the note since October 31, 1960. However, the plaintiff testified, without contradiction, that the parties hereto agreed that he should keep the payments through December 1960, that the January 1961 payment went half to him and defendant, that the defendant and Dr. Berg received the February 1961 payment, and that thereafter plaintiffs received eight monthly payments of $500.00 each, and one additional payment of $1,071.25, a total of $5,071.25. * * *

"It is ordered, adjudged and decreed that the defendant have judgment on Counts I, II, and III of plaintiffs' petition; that the defendant have a judgment on Count II of defendant's counterclaim against plaintiffs in the amount of $5,071.25; and that defendants have judgment on Count III of defendant's counterclaim declaring defendant to be the sole owner of the securities described therein."

■ We will first consider whether defendant was a holder in due course of the notes in question. The $52,500 note was dated June 10, 1960, and the first principal installment would not become due until 84 months after its date. The Eddie Clifton note was dated January 31, 1958, and was payable in monthly installments which had been paid as they fell due. The $8,500 note was dated June 10, 1960, and was payable "on or before 90 days after date." It was paid while being held in escrow. Defend-

ant did not receive this note but received the amount collected thereon in accordance with the conditional purchase arrangement entered into with Dr. Berg on July 19, 1960. For the purposes of this case we will consider that this note was assigned to defendant before maturity.

The rules of law applicable in our determination of the question presented are well established. It has been settled since the early case of Hamilton v. Marks, 63 Mo. 167, that "both upon principle and authority, and from the experience of jurists and commercial men, and the interests of the affairs of business life, it is safe to say that the liberal doctrine which promotes the free circulation of negotiable instruments, is the best, and that the good faith of the transaction should be the decisive test of the holder's rights." 63 Mo. 178. In accord with the principle stated in Hamilton, "[I]t was firmly settled long ago, beyond room for argument now, that the purchaser of a negotiable promissory note procured by fraud may not be charged with notice of an infirmity or defect by showing that he was negligent in taking the instrument or that he acquired it with knowledge of facts and circumstances that would arouse the suspicion of an ordinarily prudent person, and that nothing short of actual knowledge or bad faith will defeat the title of such purchaser. Of course, actual knowledge may be inferred from the facts and circumstances surrounding acquisition of the note but not 'from things that would merely put a prudent man on inquiry.' Commerce Trust Co. v. McGirk State Bank, 222 Mo.App. 8, 300 S.W. 526, 527(4)." Local Finance Co. v. Charlton, Mo.App., 289 S.W.2d 157, 160. See also Jennings v. Todd, 118 Mo. 296, 24 S.W. 148, Dull v. Johnson, Mo.App., 106 S.W.2d 504, and Downs v. Horton, Mo.App., 209 S.W. 595, approved on transfer, 287 Mo. 414, 230 S. W. 103. The applicable statutory provisions are in accord with the long-established case law of this state. See §§ 401.052, 401.-056, and 401.057 (all statutory references are to RSMo 1959, V.A.M.S.).

We agree with the conclusion of the trial court that defendant, on October 31, 1960, became a holder in due course of the notes in question. There certainly was no proof of actual knowledge on its part of any fraudulent representations Dr. Berg may have made to plaintiffs. The only testimony concerning a fact which might have aroused its suspicion was that of Mr. Heizelman to the effect that Mr. Gabler knew of the crack in the west apartment in September 1960. That was denied by Gabler who stated that he first learned of the crack in early November. However, even if we accept the Heizelman testimony, such would not be sufficient to warrant an inference of bad faith on the part of defendant. It is undisputed that defendants knew that these notes were in escrow and were not to be delivered to Dr. Berg until he complied with his contract. In that situation it would have been reasonable for defendant to assume that plaintiffs would not authorize the release of the notes and thereafter assign them to Dr. Berg unless they had inspected the buildings and had required Dr. Berg to make arrangements for the repair of any apparent defects, such as the foundation crack of which plaintiffs thereafter complained.

As indicated, we hold that defendant was a holder for value in due course of the aforementioned notes, and it therefore follows that it holds them "free from any defect of title of prior parties, and free from defenses available to prior parties * * *." § 401.057.

 The evidence in this record offered for the purpose of showing that Dr. Berg was acting as agent for defendant in constructing these apartment buildings is not convincing. "[T]here is no presumption of agency and the burden of establishing it is always on the party by whom it is alleged to exist." Martin v. Mercantile Trust Co., Mo.Sup., 293 S.W.2d 319, 325. There was no evidence of an express agreement of agency. Officers and directors of defendant testified that Dr. Berg

was not an agent of defendant. There is no evidence that Dr. Berg ever represented that he was acting as defendant's agent. It is true that Dr. Berg was one of defendant's stockholders and used its offices in transacting some of his business. Also, defendant loaned money to Dr. Berg and therefore took some interest in the progress of the apartment construction project here involved. However, those circumstances are not sufficient to convince us that Dr. Berg was acting as defendant's agent and we accordingly rule that contention adversely to plaintiffs.

 We will next consider the contention that the relationship between Dr. Berg and defendant was a joint adventure. "A 'joint adventure' is founded entirely on contract, either express or implied. It can exist only by the voluntary agreement of the parties to it. * * * It is in the nature of a partnership, generally governed by the same rules of law, the principal difference being that a joint adventure is usually limited to a single transaction. As a general rule, in order to constitute a joint adventure, there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in such losses as may be sustained." Gales v. Weldon, Mo.Sup., 282 S.W.2d 522, 527. The evidence has been heretofore stated in some detail and will not be here repeated. It is sufficient to state that it fails to prove the various elements essential to a finding that a joint adventure existed in this case.

 Plaintiffs have briefed the contention that the transaction whereby defendant purchased the notes in question from Dr. Berg was illegal because a part of the consideration was the cancellation of certain loans which defendant had made to Dr. Berg in violation of § 351.165. That section provides that " * * * no loan of money shall be made by the corporation to any shareholder therein; and if such loan shall be made to a shareholder, the officers making it, or who shall assent thereto, shall be jointly and severally liable to the corporation for the repayment of such loan and interest." Statutes of that nature are generally held to be directory only and loans made in contravention thereof are not void. Graham v. Young, 35 Del. 484, 167 A. 906. The penalty is that prescribed in the statute. Ward v. National Ice Cream Co., Mo.Sup., 246 S.W. 554. Dr. Berg voluntarily paid those loans by selling the instant notes to defendant. We hold that the sale of said notes was not void or illegal because a part of the consideration was the payment or cancellation of loans that had been made to Dr. Berg in violation of § 351.165.

 Plaintiffs also contend that defendant had no right to purchase the instant notes because no "Certificate to Commence Business" was issued to it during the year 1960. This is not an issue raised by the pleadings and no proof appears in the transcript supporting said contention. In that situation we must rule this point against plaintiffs.

 The third point in plaintiffs' brief reads as follows: "The court erred in not permitting plaintiffs to implead Kenneth Paul and Jeanne M. Berg as third-party defendants." There is no citation of authority to support that contention and it is not developed in any manner in the argument. The point is therefore deemed abandoned. Civil Rule 83.05, V.A.M.R.; Lansford v. Southwest Lime Co., Mo.Sup., 266 S.W.2d 564.

 Plaintiffs' next contention is that "the court erred in becoming impatient, pushing and hurrying counsel, and ordering that attorneys stipulate as to exhibits, wrongfully stating that the court had repeatedly requested that counsel stipulate, and stating on more than one occasion that there was no evidence of fraud or knowledge thereof presented when indeed there had been, causing [the] attorney for plaintiffs to become confused, uncertain and rattled and thereby resulting in the failure

of the introduction of evidence, issues and objections for and in behalf of the plaintiffs." We have carefully read the transcript and have considered it in the light of the quoted contention and conclude that the point is without merit. During most of the trial the court demonstrated unusual patience in permitting the attorneys on each side the privilege of presenting their evidence to the extent and in the manner desired by counsel. Near the end of the presentation of plaintiffs' evidence the court stated to counsel that four other cases were set for that week and it was therefore necessary that the case on trial proceed with dispatch. A short time later the court expressed dissatisfaction with the fact that much of the evidence did not have anything to do with the question of defendant's knowledge or lack of knowledge "of any fraud in the transaction." Thereafter, the court also called attention to the fact that counsel had stated to the court that they did not need a pretrial conference because they could stipulate to certain facts, and stated that the court was now unable to get counsel to stipulate as to records that were not in dispute. As a result of the ensuing colloquy, it was agreed that plaintiffs' counsel could thereafter furnish photostatic copies of certain of defendant's office records which plaintiffs desired be considered in evidence.

The trial court is possessed with considerable discretion in matters concerning the conduct of the trial. "It is a long established rule that the determination of matters pertaining to the actual conduct of the trial of a cause is left by the law largely to the discretion of the trial judge. In the very nature of the matter this must necessarily be the rule, and appellate courts are not authorized to interfere with the exercise of such discretion on the part of a trial judge unless it clearly appears that he has abused his discretion." Koeppel v. Koeppel, Mo.App., 208 S.W.2d 929, 936. We are convinced that the trial court did not abuse its discretion in regard to the matters here-

in complained of. As indicated, we rule this point against plaintiffs.

■ Another point briefed by plaintiffs is that "the court erred in not finding that the defendant was unjustly enriched in its finding that 'securities of this nature (a fourth mortgage!) are commonly discounted quite heavily.'" In connection with that contention we observe that unjust enrichment was not one of plaintiffs' pleaded grounds for recovery. Also, the fact that defendant purchased these notes at a discount would not preclude a finding that it was a holder in due course, for value, of said notes. Therefore, the finding (or judicial notice) of the trial court that "securities of this nature (a fourth mortgage) are commonly discounted quite heavily" was not essential to the court's conclusion that the defendant was a holder of the notes in due course. We will therefore not extend this already long opinion by determining whether the trial court was warranted in finding, or taking judicial notice of the fact, that securities of the nature here involved are commonly discounted quite heavily.

■ The next point briefed by plaintiffs is that "the court erred in finding that 'the plaintiff husband had every opportunity to acquaint himself with the physical condition of the apartment houses on every day for months prior to the date of the transfer of the securities.'" This finding was not essential to the court's conclusion that defendant was a holder of the notes in due course. However, the uncontradicted evidence clearly shows that plaintiff had every reasonable opportunity to acquaint himself with the condition of those buildings. He was living in Springfield and visited the project frequently. For about a month prior to October 31, 1960, he worked on the east apartment which was located a short distance from the west apartment. He may have failed to acquaint himself with the condition of both structures, but he undoubtedly had the opportunity to do so. We rule this point against plaintiffs.

Plaintiffs have made other points in their brief concerning allegedly erroneous findings (which were not essential to the judgment) and complain of the failure of the trial court to give proper consideration to certain evidence offered by them. We overrule those contentions without further specific discussion. It is sufficient to state that the trial court found the essential facts to support the judgment in favor of defendants. We not only defer to the trial court in that regard, but have independently arrived at the same conclusion.

■ In their motion for new trial plaintiffs sought a new trial because of newly discovered evidence. Several weeks after the motion was filed they filed five affidavits in support of that assignment. It appeared from those affidavits that the persons who signed them would have testified that Mr. Gabler knew of the foundation crack before October 31, 1960, and that he sometimes gave orders to the workmen on the project.

Civil Rule 78.03 provides that affidavits supporting a motion for new trial "shall be served with the motion." The rule was not complied with in this instance and therefore the affidavits should be disregarded. Tuttle v. Tomasino, Mo.Sup., 336 S.W.2d 683 [1].

However, even if the affidavits are considered, they do not afford a basis for holding that the trial court abused its discretion in denying a new trial on the ground assigned. "It is well settled that a party who seeks a new trial on such ground should (to obtain such relief) be required to show: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different result if the new trial were granted; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be produced, or its absence accounted for; and (6) that the object of the testimony is not merely to impeach the character or credit of a witness." Young v. St. Louis Public Service

Co., Mo.Sup., 326 S.W.2d 107, 111. In this case there was no showing of any reasonable excuse as to why this testimony could not have been obtained, with diligence, prior to trial. Also, the testimony would have been merely cumulative in that the same facts appear in the testimony of Mr. Heizelman. Another function of the proposed testimony would have been merely to impeach the credit to be given to the testimony of Mr. Gabler. We are also of the opinion that such testimony would probably not produce a different result if a new trial were granted. For the reasons stated, we rule that the trial court did not err in refusing to grant a new trial because of newly discovered evidence.

The judgment is affirmed.

All concur.