Clarence MITCHELL, a Minor, by His Father and Next Friend, James Mitchell, Appellant,

v.

Carl MOSHER and Andrew M. Munro, Respondents.

No. 49342.

Supreme Court of Missouri,

Division No. 1.

Dec. 11, 1962.

James F. Koester, St. Louis, for appellant.

Samuel Richeson, Dearing, Richeson & Weier, Hillsboro, Ralph M. Crow, Breuer, Northern & Crow, Rolla, for respondents.

HOLLINGSWORTH, Judge.

Plaintiff, a minor suing by next friend, sought damages in the sum of $75,000 for personal injuries sustained when an automobile operated by defendant Carl Mosher, in which plaintiff was a passenger, came into head-on collision with an automobile operated by defendant Andrew M. Munro. Oscar O. Groff, whose automobile was stopped upon the highway at the scene of the collision, was also named as a party defendant. Trial of the issues resulted in a verdict in favor of plaintiff against defendants Mosher and Munro in the sum of $2,500 and a directed verdict in favor of defendant Groff. Plaintiff appealed to the Springfield Court of Appeals from the judgment rendered in accordance with the aforesaid verdict. That court transferred the cause to this court on grounds the amount in dispute vested jurisdiction in this court. Mo.App., 352 S.W.2d 932. After the appeal reached this court, it was dismissed as to defendant Groff. The amount in dispute, exclusive of costs, ($75,000 sought, $2,500 awarded) being in excess of $15,000, jurisdiction lies in this court. Article V, § 3, Constitution of Missouri, V.A.M.S.; § 477.040 RSMo 1959, V.A.M.S.; Glore v. Bone, Mo., 324 S.W.2d 633, 634 [1, 2];

Pinkston v. McClanahan, Mo., 350 S.W.2d 724, 725.

Plaintiff has briefed and urges but one of the assignments of error set forth in his motion for new trial: that the trial court erred in denying him a new trial because of gross inadequacy of the verdict. A brief statement of the nature of the collision sheds some light upon the question before us. The collision occurred on State Highway No. 19, nine miles south of Owensville, Missouri, immediately south of the crest of a hill, at about 12:35 a. m., on May 3, 1959. The northbound Mosher car, in which plaintiff was riding as a passenger in the front seat, came up to the scene of an earlier collision. There two automobiles, both facing north, rested partly upon the east lane and partly upon the east shoulder of the highway. Mosher slowed his car and started around the left side of them. As he was passing the second (Groff) automobile, defendant Munro, southbound, at 45 to 60 miles an hour, came over the crest of the hill and into head-on collision with the Mosher car, knocking it backward a distance of 30 feet to and against a stone wall erected upon or adjacent to the west shoulder of the highway.

Plaintiff, then aged 17 years, was thrown forward and his head went through the windshield of the Mosher car. He went immediately to see a doctor at Owensville, who "checked [him] over", but gave him no treatment and made no mention of finding any injury to his back. He returned to and examined the scene of the collision and then went home, arriving around 3 or 4 o'clock in the morning. On the next day, he consulted Dr. Fiedler, an osteopathic physician at Bland, Missouri, who sent him to the Charles E. Still Osteopathic Hospital at Jefferson City. He remained in the hospital for a period of five days, under the care of Dr. Richard A. Michael, an osteopathic physician.

The records of the hospital were placed in evidence. To the extent read into the record, these records showed, in substance, that plaintiff was a 17-year-old white male, well nourished, whose chief complaint was radiation of pain in the left scapular region, caused in a car wreck, and that X-rays showed radiographic evidence of compression fractures in the dorsal region. The diagnosis was compression fractures of dorsal vertebrae. The treatment consisted of a body cast made of plaster of paris being placed upon him.

Plaintiff testified: He never had any trouble with his back prior to the collision. At the time of the collision and for some time prior thereto, he was regularly employed by the Brown Shoe Company at Dixon as a "laster", for which he was paid the sum of $1.00 per hour. He wore the cast fitted to his body at the Still Hospital, which extended from his shoulders to his hips, for six weeks, during which time he stayed "mostly in bed". At the end of that period, the cast was removed by Dr. Michael and a Taylor brace was fitted to his back. He wore the brace regularly for a period of six months; since then he has worn it two or three times a week, when his back hurts the most. He was unable to do any work of any kind for eight months. He then went to work at Monarch Furniture Company in St. Louis, where he remained employed for four months, but was unable to defray his living expenses on the wage there received. He then went to work for Kingsford Charcoal Company, where he was paid $1.35 to $1.40 an hour. That job, among other tasks, required him to lift bags, some weighing as much as 50 pounds. At the end of ten months, he was unable to continue because of his back and inability to sleep and quit that job on October 22, 1960. For five months thereafter he was unable to find employment. About three weeks before trial time he found a job at Buford Transfer Company, Belle, Missouri, where he is now employed, although his back still hurts when he twists or bends his body.

Dr. Richard A. Michael, a qualified osteopathic physician, testified: He graduated in 1944. He specializes in general sur-

gery and is a member of the staffs of the Still Osteopathic Hospital, the Callaway County, Phelps County and Pulaski County Hospitals. He caused X-rays to be made of plaintiff's back upon the latter's admission to the hospital on May 4, 1959. They revealed multiple injuries in the dorsal spine, compression fractures to the fifth, sixth, seventh and eighth dorsal vertebrae. A compression fracture flattens, mashes down the vertebra and causes it to be wedge-shaped. Such a fracture is caused by severe flexion or forcible bending of the spine. An X-ray, taken in September following the collision in May, still showed the injured condition found in the first X-rays taken. When fractures such as those shown occur, they cause the muscles and ligaments between the vertebrae to become bruised and torn and fibrous excess growth sets up. That occurred in plaintiff's back. The body cast, as described by plaintiff, was applied, followed by the Taylor brace. The brace consisted, primarily, of a rod which fitted the contour of his back and was held in place by straps which extended around his body and fastened in front. Its purpose was to keep his spine from being bent forward during the period it was worn. Plaintiff will require further medical care; bending or twisting of his body will always cause him pain. His spine is permanently injured to the extent of 20 per cent of its condition prior to his injuries; and it is the witness' belief that the condition thus shown is the result of the collision.

The evidence adduced by defendants, insofar as material to the question presented on appeal, was that of Dr. Fred Tietjen, a duly qualified doctor of medicine, residing in Jefferson City, specializing in orthopedic surgery and maintaining offices in Jefferson City and Rolla. He testified: He graduated from medical school in 1948 and is on the staffs of the Phelps County Hospital and St. Mary's and Memorial Hospitals in Jefferson City. At the request of defendants, he examined and caused X-rays of plaintiff to be made at Phelps County Hospital on February 23, 1961. When shown one of the X-rays taken of plaintiff at the direction of Dr. Michael, he said it revealed four vertebrae to be involved. It was his judgment, however, that the condition found was due to juvenile epiphysitis. That is a condition causing abnormality of the skeletal system, which occurs during the adolescent period of a child, especially between the ages of 12 to 16 years, during which time the vertebrae are growing. As the witness interpreted the X-ray, there was a roughening between the intervertebral spaces, an irregularity and some wedging, some compressing between the seventh and eighth vertebrae. A "wedging" is one sign of injury, but in this case the witness could not believe that force would create injury to so many vertebrae. Such a condition as that shown in the X-ray is more commonly the result of unusual epiphysitis.

When shown the later X-ray, taken at the direction of Dr. Michael in September, 1959, the witness said it also revealed evident wedging but he could not see any protrusion of the bone, as is nearly always shown in cases of fracture.

X-rays taken at Rolla at the direction of the witness were then introduced in evidence and interpreted by him. He said they showed no evidence of compression as the result of fracture. He did testify, however, that one of the X-rays taken at his direction did show a "minimal compression fracture of the intervertebral body", which, he said, could be consistent with a fracture on May 3, 1959, but he saw nothing else on the films taken at his direction to indicate injury to the back from the automobile collision in May, 1959. He further testified that a minimal fracture of less than 10 per cent compression is common, seen frequently, and results only in minimal injury. The witness admitted that the differences shown between the X-rays taken at his direction and those taken at the direction of Dr. Michael were that the X-rays taken at the Still Hospital were "actually in better quality than the films"

taken at Rolla. He further testified, in substance, however, that the extent of the wedging shown in Dr. Michael's pictures indicated that the condition there shown resulted from epiphysitis rather than trauma, because, he said, if the condition seen in the Michael X-rays was the result of trauma, there would not be as many vertebrae involved; an injury such as would produce the condition shown in the Michael X-rays would tear apart the spine, instead of the minimal compression shown in those pictures; the wedging of four or five vertebrae resulting from force tears apart the spine, dislocation and paralysis from that time on.

■■■■ In considering whether the trial court erred in overruling plaintiff's motion for a new trial predicated upon inadequacy of the verdict, the appellate court views the evidence in the light most favorable to the ruling of the trial court. Polizzi v. Nedrow, Mo., 247 S.W.2d 809, 811; Glore v. Bone, Mo., 324 S.W.2d 633, 635 [3]; Pinkston v. McClanahan, Mo., 350 S.W.2d 724, 728 [2], [3]. The appellate court, unlike the trial court, does not weigh the evidence. Rather, it seeks to ascertain only whether the trial court abused its discretion in ruling as it did. In other words, was there substantial evidence to support the verdict? "Substantial evidence to support the verdict", as that phrase is applicable to the question here presented, requires determination of whether the amount of damages awarded is responsive to the evidence; and where the jury, as in this case, has found liability, it is also the jury's duty to award plaintiff damages commensurate with the personal injuries and other compensable loss sustained by him. Consequently, a verdict which is not supported by the evidence as to the amount of damages must be set aside as promptly as a verdict that is not supported by the evidence at all. Pinkston v. McClanahan, Mo., 350 S.W.2d 724, 728–729, and the cases therein cited and relied upon.

One of the troublesome features of the problem with which we are confronted is that the evidence as to the severity of the injuries sustained to plaintiff's spine is directly conflicting and may support a finding by the jury either that the injuries were quite extensive or that they were "minimal". The testimony of plaintiff relating to the loss of earnings sustained by him was that he was regularly employed as a "laster" by Brown Shoe Company at a wage of $1.00 per hour when the collision occurred and that he was unable to work at all thereafter for a period of eight months; that he then went to work for a furniture company in St. Louis at an hourly wage of $1.10 and raised to $1.25, which employment he voluntarily relinquished; that the next employment obtained by him was at Kingsford Charcoal Company, where he worked regularly for a period of ten months at a wage of $1.35–$1.40 per hour; that the work at the Kingsford Charcoal Company required him sometimes to lift bags weighing 50 pounds, which caused his back to hurt and rendered him to be unable to sleep, necessitating his leaving that job; and that he was unable to find any other employment for a period of five months. The two periods of unemployment computed, respectively, on the basis of a loss of earnings, viz., 8 months (35 forty-hour weeks at $1.00 per hour) and 5 months (22 forty-hours weeks at $1.35 per hour), would amount to a total loss of wages in the sum of $2,588.00. His contention is that the amount of the verdict shows that the jury undertook to award him damages for the amount of his wages only and awarded him nothing for his injuries.

■■■■ Defendants contend that plaintiff's position is not tenable because there is no ground upon which such a conclusion may be reached other than pure speculation; and, moreover, that no award could lawfully have been made for wages earned by plaintiff, for the reason that there was no evidence that he, a minor, had been emancipated. As a general rule, of course, loss of earnings or loss of earning capacity of a minor is a loss to his parents, who are entitled to both his earnings and his serv-

ices Evans v. Farmers Elevator Company, 347 Mo. 326, 147 S.W.2d 593, 598. But, where, as here, a parent institutes and prosecutes the action as next friend and in the petition alleges loss of earnings on the part of the minor by reason of his injuries and seeks judgment therefor in the name and for the use of the minor, a different rule applies. The record shows no objection whatever was raised to the right of plaintiff to recover for loss of earnings, as pleaded in the petition, as testified by him at the trial, and as expressly submitted in the measure of damages instruction given in his behalf. Under these circumstances, defendants cannot now assert that he was not entitled to recover for any loss of earnings sustained as a direct result of negligence of defendants. Hufft v. Kuhn, Mo., 277 S.W.2d 552, 555; Garrison v. Ryno, Mo., 328 S.W.2d 557, 564.

■ Defendants further contend, however, that it was the sole province of the jury to believe or disbelieve every word or any portion of plaintiff's testimony about his injuries and his physical condition and to return its verdict in accordance with those findings; and that the verdict reflects that the jury did not believe he sustained either personal injuries or loss of earnings to the extent shown by the evidence adduced in his behalf. We find nothing in the record to indicate how the jury arrived at the amount of its award or the reasoning upon which the trial court, after weighing the evidence, approved it. So the question, as we see it, is: May the verdict be approved as being founded upon any reasonably rationalized basis? Without any suggestion whatever as to what we may think as to the extent of plaintiff's injuries or his loss of earnings as a result thereof, we have concluded it may. One possibility will suffice: The verdict could reflect an effort on the part of the jury to compensate plaintiff for the loss of wages during the first 8-month period of his unemployment, denying compensation for wages thereafter on grounds that the later 5-month period of his unemployment was not attributable to his injuries, and then awarding him $1,000 or more for the personal injuries sustained by him, which the jury found not to be so extensive and painful as to warrant a larger award on that account. In any event, we think it clear that a verdict based upon a finding such as that above hypothesized would not be so unreasonable as to require the trial court to set it aside. Conceivably, it could be so justified upon numerous other bases within the range of the evidence and the jury's belief or disbelief of one or more of the several aspects thereof.

It follows that the verdict being within the range of reasonably possible findings made by the jury, the trial court, whose duty it was to weigh that evidence and who both saw and heard the witnesses in behalf of both plaintiff and defendants, cannot be convicted of an abuse of discretion in approving it.

The judgment is affirmed.

All concur.