**Howard Cyril MILLER, Appellant,**

v.

**Boyd Cleo HARNER, Respondent.**

No. 49523.

Supreme Court of Missouri,

Division No. 1.

Jan. 13, 1964.

Robert L. Shirkey, Rogers, Field & Gentry, Kansas City, for plaintiff-appellant.

Lewis W. Sanders, Gordon, Sanders, Adams & Niewald, Kansas City, for respondent.

HOLLINGSWORTH, Judge.

On May 5, 1960, plaintiff, Howard Cyril Miller, an employee of Navajo Freight Lines with its principal offices at Albuquerque, New Mexico, operating an International tractor-trailer unit southward on the right side of the center of U. S. Highway 69, approached a bridge about two miles south of Cameron, Missouri. At the same time defendant, Boyd Cleo Harner, an employee of Universal Trailer Manufacturing Corporation, operated a Ford truck pulling a house trailer northward across the bridge. As Harner crossed the bridge, he so operated his truck and house trailer as to cause portions thereof to proceed along the left of the center of the highway. After his truck passed over the bridge, Harner steered the truck toward the right side of the highway, which caused the house trailer as it followed the course of the truck to come into contact with the rear view mirror attached to the left front side of Miller's approaching tractor. That contact bent the mirror backward into the cab of Miller's tractor, where it struck him in such manner as to knock him into the gearshifts, causing him to be injured.

In this action, plaintiff, alleging negligence on the part of Harner in the operation of his truck and house trailer attached thereto, sought damages in the sum of $150,000 for injuries, loss of earnings, medical expense, etc., allegedly sustained and directly caused by the collision. The jury returned a verdict in favor of plaintiff for the sum of $4,000. Plaintiff appealed on the sole ground that the trial court abused its discretion in denying him a new trial on grounds of gross inadequacy of the verdict.

■ For jurisdictional purposes in a situation such as is here presented, the amount in dispute, in the absence of exceptional circumstances not here shown, is taken to be the difference between the amount sought in the petition and the amount of the verdict, in this case in excess of $15,000. Jurisdiction is therefore vested in this court. Article V, § 3, Constitution of Missouri,

V.A.M.S.; Section 477.040, RSMo 1959, V.A.M.S.; Glore v. Bone, Mo., 324 S.W.2d 633, 634 [1, 2]; Mitchell v. Mosher, Mo., 362 S.W.2d 532, 533 [1].

Plaintiff's basic contention on appeal is that as a direct result of the collision he sustained injury to an intervertebral disc in the lower portion of his spine, generally referred to in the evidence as the disc between vertebrae L-5 and S-1 (lumbar 5 and sacral 1), necessitating surgery, which caused him to incur medical and hospital expense in the sum of $2,272.83 and loss of earnings in excess of $6,900; and that the verdict of $4,000 not only fails to compensate for that expense but awards him nothing for past and future pain and permanent partial disability directly resulting from the collision. Defendant, on the other hand, contends that consideration of the evidence pertaining to the extent of plaintiff's physical infirmities and the results normally expected to flow from them demonstrates that there was a question for the jury in the first instance and for the trial judge on motion for new trial as to whether plaintiff received the injury alleged or suffered the infirmities allegedly resulting therefrom in this accident; and that the trial court did not abuse its discretion in overruling plaintiff's motion for a new trial on the issue of damages only.

Plaintiff, born and reared in Ohio, aged 34 at the time of trial in February, 1962, testified: He resided in Albuquerque, New Mexico, where he had been employed as a truck driver for Navajo Freight Lines, with a regular run from Albuquerque to Chicago and return for the past five years. Prior thereto, he had driven trucks, both as a "wildcatter" and as an employee of others, including, among others, Ralph Malone, an independent operator, "Kroger" and Riss & Company. At the age of 18 to 20 years, plaintiff, while driving a milk truck, sustained an injury to his back and went to see Dr. John A. Judy at Dayton, Ohio, on two occasions. The injury was not severe and he did not have to wear a brace. Since that time, he continuously had earned his livelihood in the trucking business, which for many years required him to lift and unload heavily weighted crates, containers and materials. In recent years, however, there has been a change in trucking; drivers are not required to do much lifting.

In November, 1952, while working for Malone, he sustained another injury to the middle of his back, just above the belt line, when a truck driven by him hit a bridge abutment. He was hospitalized and a "spinal fusion" operation was performed on his middle back. Following that injury and operation, he was unable to work for a period of some 8 to 12 months; then, after passing a physical examination, he returned to work for Malone as a truck driver.

Before going to work for Navajo, he took and passed the physical examination required by I.C.C. Since recovery from the injuries sustained in 1952, he not only worked regularly as a truck driver but was able to do almost everything he wanted to do, such as swimming, playing ball, wrestling with his children; he had no physical handicap whatever, until the collision of May 5, 1960, involved in this lawsuit, which occurred about 3:30 p. m.

The rear view mirror attached to the cab of the tractor extends out from the left side of the tractor about four inches and weighs about 20 pounds. When defendant's trailer hit that mirror and knocked it inside the cab, it struck plaintiff on the elbow, knocked his right hip over into the gearshifts and bent him "real sharp" over the gearshifts. The next thing of which he was conscious was that his assistant driver was holding him up and trying to steer the outfit. The mirror was against plaintiff's shoulder. His outfit was stopped some distance beyond the point of collision. Plaintiff, after trying to push the mirror back out the window, got out of the cab, was faint and dazed, sat down on a ditch bank, and finally walked back to the scene of the collision. His elbow, neck, head and back were hurting, the principal pain at that time being in his elbow. A highway patrolman took him to the Cameron Community Hos-

pital about 5:00 p. m. There he saw Dr. Bloom, who examined and had x-rays taken of him, during which plaintiff fainted. He suffered pain in his head, back, neck and right hip and his hip was placed in traction for varying periods of time during the 13 days he remained in the hospital.

The Cameron Community Hospital records, as read into evidence by counsel for plaintiff, show: On admission to the hospital on May 5, 1960, "acute post traumatic arthritis of the left elbow" ; that plaintiff was given sedatives and treated for pain in back and hips and placed in pelvic traction; that on May 18 his condition warranted dismissal; and that he was discharged on that date with final diagnosis: "Acute post traumatic arthritis, left elbow; whiplash injury cervical and lumbar spine", at which time he was "improved".

He was taken to Kansas City and from there traveled by air to Albuquerque. He has not seen Dr. Bloom since leaving the hospital at Cameron. On arrival at Albuquerque, he consulted Dr. Eugene P. Szerlip, a bone specialist, who caused him to be hospitalized for four or five days, during which time his hip and back were causing him much pain, which extended from his low back to the groin, and his left leg was numb.

Dr. Szerlip prescribed a girdle which had steel stays in the back of it and extended from his rib cage down to about his hips. After discharge from the hospital and wearing the brace awhile, he was again hospitalized for a period of five days under Dr. Szerlip's care. Dr. Mosier, a neurosurgeon, was also called into consultation by Dr. Szerlip. After being discharged from the hospital, his elbow, neck and head were not so painful, but the pain in his hips, groin and leg worsened. He returned to work for Navajo in August or September, 1960, and was placed on the extra board, which enabled him to take selected short trips. That work required him to do no loading or unloading. His condition became no better and Dr. Szerlip again had him hospital-

ized at St. Joseph's Hospital on September 6th or 7th, at which time he made a discogram of the low back, following which he advised an operation, but plaintiff did not submit to it until November, 1960. At that time a degenerated disc was removed from his lower spine and he was fitted with a brace, which holds his back stiff.

By April, 1961, the pain in his elbow, head and neck and a burning sensation in his shoulder had pretty well cleared up. Since returning to work in April, 1961, he did only "solo" operations and short runs, no lifting for about three weeks, then returned to his Albuquerque-Chicago run, where he has worked since. He, however, still suffers pain around his hip bones, which extends to his knees and down his left leg, of which he does not have good control; cannot bend over a washbowl, lace his shoes or put on his socks. He was advised by Dr. Szerlip not to lift more than 35 pounds in weight.

In the year 1959, plaintiff's annual income paid on a driven-mileage basis was in excess of $11,000. In 1960, it was $7,818.21, the reduction being due to loss of time because of injuries sustained by him in the collision here involved. In 1961, he worked eight and a half months for which he received $9,151.50. His average income when he went back to work in 1961 was $1,076 a month. His loss of earnings, due to inability to work, was in excess of $6,900. The outlay for doctors and hospitalization incurred by him as a direct result of the injuries in the collision upon which this suit is based amounts to $2,272.83; a total pecuniary loss of $9,172.83.

On cross-examination, plaintiff admitted that following the 1952 accident Dr. Judy mentioned tuberculosis of the spine to plaintiff and he was for a time placed in a tuberculosis hospital. That condition healed and he never thereafter had any trouble from it.

Dr. Eugene P. Szerlip, an admittedly qualified neurosurgeon, testified by deposition in behalf of plaintiff as follows: He is

a resident of Albuquerque, New Mexico, engaged in the practice of his profession. He first saw plaintiff on May 21, 1960. Plaintiff gave him a history of the collision of May 5, 1960, and the injuries sustained by him. Plaintiff also told him that he had had an injury to his back in 1952, which resulted in hospitalization and surgical spinal fusion of the upper part of his lumbar spine.

Dr. Szerlip gave plaintiff a complete physical examination. He stood symmetrically and moved about freely. Numerous x-rays were taken of his body. The scars from the spinal fusion operation were healed and flattened. There was pain and tenderness in the lower portion of his back. Dr. Szerlip's conclusions at that time were: "It was my impression at that time that the patient had suffered a sprain of his neck and back which at that time presented residuals of rather mild nature."

Shortly thereafter, however, plaintiff again saw Dr. Szerlip, at which time the doctor noted that plaintiff was suffering emotional disturbances and referred him to Dr. Jack Mosier, a neurologist. On May 23, Dr. Mosier placed plaintiff in St. Joseph's Hospital. He was released within a few days and was again seen by Dr. Szerlip. At that time he complained of low back pain in his right inguinal area and groin and was "upset and jumpy". On June 1, plaintiff was seen by Dr. Evilsizer, a neuropsychiatrist. That examination was negative. On June 22, Dr. Szerlip found discomfort in plaintiff's lower back. He again saw plaintiff on July 18 and August 19. The pain that had been only in his lower back had spread to the testicles. On October 19, that pain was more severe. Dr. Szerlip concluded that plaintiff was suffering from lumbosacral disease and in need of surgery. He operated on plaintiff's back on November 21, 1960, and removed a herniated disc between vertebrae L-5 and S-1 and placed a bone graft therein. Plaintiff left the hospital on November 28, wearing a brace. The doctor saw him several times in the spring of 1961, had additional x-rays made, and permitted him to return to work, cautioning him not to engage in heavy lifting or excessive bending.

Based upon his findings as above set forth, Dr. Szerlip's final conclusions were that plaintiff suffered a protrusion of the disc at the lumbosacral level as a result of the stress placed on that part of his back when he was injured in the accident here involved; that the disc probably had undergone some normal changes with aging previous to the injury, but that the protrusion and the pain arose as a result of the injury sustained in the collision which became superimposed on the previous condition of the disc; that the fusion procedure may not be entirely successful and may break down under normal usage of his back. With an injury sufficient to cause protrusion of one disc, there is often injury to the discs immediately above it and that injury may eventually lead to premature breaking down and to the origin of painful symptoms arising from the disc above the one which has caused his present difficulty; so that plaintiff will have to refrain from heavy use of his back in the future.

On cross-examination, the doctor said it is possible that the 1952 accident, which also resulted in a spinal fusion, could have damaged the disc between L-5 and S-1, and may have been a factor in the degeneration of the latter disc.

Dr. Frank L. Feierabend, a doctor of medicine, specializing in industrial and orthopedic work, with offices in Kansas City, Missouri, testified in behalf of plaintiff as follows: He examined plaintiff in February, 1962. In that examination he found two scars on plaintiff's back, one in the upper lumbar area, about the middle of plaintiff's back, and the other in the lumbosacral area in his low back. Both, completely healed, are the result of surgery. There were muscle spasms in the lumbar area on both sides. Muscle spasm is caused only from pain. The doctor then made a complete examination of plaintiff and took x-rays of his back. The examination and x-rays showed that the earlier surgery in

plaintiff's middle back was healed and solid. Examination of the surgery performed in the lower back, in the L-5, S-1 area, revealed that the bone graft had not been replaced by new bone; it is not solid. That result is not the fault of the doctor who did the operation; it often happens. Plaintiff will be subject to more surgery and another fusion in the area of the latter operation, performed in 1960. Assuming that plaintiff had enjoyed good health since 1952, when the earlier operation was performed; that since then he had done the heavy work incidental to truck driving until the May 5, 1960, injury, such as plaintiff claimed to have received, it is the witness's opinion that the infirmities of which plaintiff suffered were caused by the collision of May 5, 1960, and the condition found following the operation for the latter injury is permanent.

The evidence in behalf of defendant, material to the question presented, consisted of the deposition of Dr. Jack Mosier taken on May 10, 1961, and the oral testimony of Dr. Frank R. Williams.

Dr. Mosier testified: He is a doctor of medicine, residing in Albuquerque, New Mexico, and specializing in neurology, which is directed to diseases of the central and peripheral nervous systems, and other diseases of the nervous system. Dr. Szerlip referred plaintiff to him on May 23, 1960, because of multiple aches, peculiar sensations, specific pain below the shoulder blades and low back region, headaches, pain radiating down the back to both groins, in the legs, and slowness of thinking.

Examination of plaintiff revealed no objective findings. The complaints of pain made by plaintiff were not the usual symptoms found in an injury to the disc space between L-5 and S-1 vertebrae. Plaintiff suffered no radiating pain in the sciatic area. He had loss of sensation in the groin region on the right side, which is not the likely result from an injury to the L-5, S-1 disc area. He had psychomotor retardation and was slow in his movements

and thinking and suffered a disturbance in special relationship of objects visually. These things produce worry, but there was no organic basis for it; it was functional, psychological. A normal finding in L-5, S-1 injury is the absence of an ankle jerk; there was an ankle jerk in plaintiff. A neurological finding in a disc is possible when it pushes against the nerve root or spinal cord; most discs do not do this. When there is such pressure it is manifested by paralysis and weakness of the muscles involved, loss of sensation.

On cross-examination, Dr. Mosier could not say that the accident actually caused mechanical damage or injury to him. When he first saw plaintiff, he suspected injury to his ilioinguinal nerve, but that was not verified. He examined plaintiff only from a neurological point of view, checking sensory findings, reflex changes, nerve root irritation. The doctor could not demonstrate a disc injury to plaintiff's back, but he did not carry out every procedure that could be done.

Dr. Frank R. Williams, a physician in Kansas City, Missouri, specializing in orthopedic surgery, testified: After obtaining plaintiff's history and his present complaints (as outlined by plaintiff and Dr. Szerlip's testimony), he examined plaintiff. His conclusion was that the symptoms are not those symptoms usually found in the L-5, S-1 level. The symptoms shown by plaintiff are referable to the lower dorsal and upper lumbar area. The doctor concluded that the 1952 operation scar over the lower dorsal, upper lumbar area was well healed. A thorough physical examination of plaintiff revealed nothing at all diagnostic in the complaint of pain with disc pathology attributable to the L-5, S-1 area.

X-ray films taken by Dr. Williams were interpreted by him to reveal that the first lumbar vertebra had fused with the vertebrae above and below in the middle back area, which he concluded was due to disease process which plaintiff had suffered from the old tubercular infection. The

x-rays taken by the doctor, which did not show the discs, revealed no narrowing between L–5 and S–1. Assuming the collision occurred as stated by plaintiff, the doctor was of the opinion that the complaints of plaintiff were out of proportion to the accident. The doctor, asked to assume the operation performed by Dr. Szerlip and the removal of a herniated disc as testified by the latter, gave it as his opinion that the symptoms of which plaintiff complained were not caused by a herniated disc at level L–5, S–1.

▬ The evidence above set forth unquestionably is conflicting as to the cause and extent of plaintiff's alleged injuries and infirmities allegedly resulting therefrom. Our function is not to decide that issue; it is to determine whether defendant's theory is supported by substantial evidence. As stated in Mitchell v. Mosher, Mo., 362 S.W. 2d 532, 536 [2–5]:

"In considering whether the trial court erred in overruling plaintiff's motion for a new trial predicated upon inadequacy of the verdict, the appellate court views the evidence in the light most favorable to the ruling of the trial court. Polizzi v. Nedrow, Mo., 247 S.W.2d 809, 811; Glore v. Bone, Mo., 324 S.W.2d 633, 635 [3]; Pinkston v. McClanahan, Mo., 350 S.W.2d 724, 728 [2], [3]. The appellate court, unlike the trial court, does not weigh the evidence. Rather, it seeks to ascertain only whether the trial court abused its discretion in ruling as it did. In other words, was there substantial evidence to support the verdict? 'Substantial evidence to support the verdict', as that phrase is applicable to the question here presented, requires determination of whether the amount of damages awarded is responsive to the evidence; and where the jury, as in this case, has found liability, it is also the jury's duty to award plaintiff damages commensurate with the personal injuries

and other compensable loss sustained by him."

The question is: Did the testimony of Dr. Mosier and Dr. Williams, or either of them, constitute substantial evidence that plaintiff did not sustain injury to the intervertebral disc between lumbar vertebra 5 and sacral vertebra 1 of his spine which thereafter produced the infirmities and consequent disabilities, pain and suffering of which he complains?

As we interpret Dr. Mosier's testimony, he examined plaintiff only from a neurological point of view and that the neurological symptoms found by him did not warrant a finding that plaintiff's infirmities, pain and suffering were attributable in any degree to any injury sustained to said disc. As we interpret Dr. Williams' testimony, his findings were that the symptoms of which plaintiff complained were not referable to the spinal area from which the disc was removed; rather were they due to an old tubercular condition in the middle-upper spinal area.

▬ It should here be noted that plaintiff makes no contention whatever that the infirmities for which he seeks to recover resulted in any degree by reason of aggravation of any antecedent injuries or disease suffered by him. To the contrary, his position is that he had entirely recovered from those injuries and disease; that prior to the collision of May 5, 1960, he was a well man and that all of his infirmities and consequent pain and suffering were and are the direct result of a protruding intervertebral disc between L–5 and S–1, which, he contends, was injured in the latter collision. Our conclusion is that the proof adduced by defendant constituted substantial evidence that neither the major portion of plaintiff's medical expense nor any appreciable portion of his infirmities or suffering subsequent to his discharge from the Cameron Community Hospital was attributable to the trauma sustained by him in the collision.

If the jury found the facts with respect to plaintiff's allegedly herniated L–5, S–1 disc to be as defendant's evidence tended to show (and, incidentally, as was Dr. Szerlip's impression when he first saw plaintiff), may this court say that the verdict was shockingly inadequate? The trial court, whose duty it was to weigh the evidence in ruling the same assignment in plaintiff's motion for new trial, did not so find. Our review of the whole record on appeal shows no abuse of its discretion in that respect.

Accordingly, the judgment is affirmed.

All concur.