Wilma CHAPMAN, Plaintiff-Appellant,

v.

Mason H. KING, Defendant-Respondent.

No. 8460.

Springfield Court of Appeals.

Missouri.

Oct. 28, 1965.

A. L. Shortridge, Joplin, for plaintiff-appellant.

Robert E. Seiler, Karl W. Blanchard, Joplin, for defendant-respondent. Seiler, Blanchard & Van Fleet, Joplin, of counsel.

STONE, Judge.

In this jury-tried damage suit for personal injuries resulting from a vehicular collision, plaintiff Mrs. Wilma Chapman had judgment for $500 against defendant Mrs. Mason H. King. On this appeal by *plaintiff*, her complaints are that the verdict "was so grossly inadequate as to indicate bias and prejudice of the jury," that the trial court abused his discretion in refusing to grant plaintiff a new trial on the ground of newly-discovered evidence, and that the court erred in giving defendant's instructions 8, 9 and 10.

The transcript on appeal, as it came to us, raised a question as to our appellate jurisdiction, for the prayer of plaintiff's petition was for damages in the sum of $25,000 and she had judgment for $500. Thus, on the face of the record, our Supreme Court would have been vested with exclusive appellate jurisdiction [Art. V, Sec. 3, Const. of 1945; V.A.M.S. § 477.040] under the general rule that, in the absence of "exceptional circumstances" [Glore v. Bone, Mo., 324 S.W.2d 633, 634; Combs v. Combs, Mo., 284 S.W.2d 423, 424] such as those which we discussed in Mitchell v. Mosher, Mo.App., 352 S.W.2d 932, the amount in dispute where plaintiff appeals

from an allegedly inadequate judgment is the difference between the amount prayed for and the amount of the judgment. Miller v. Harner, Mo., 373 S.W.2d 941, 942(1); Mitchell v. Mosher, Mo., 362 S.W.2d 532, 533(1); Rossomanno v. Laclede Cab Co., Mo. (banc), 328 S.W.2d 677, 679(1). However, in the jurisdictional statement in plaintiff's brief, we were told that "the amount in dispute is less than $15,000"; and, at the time of submission, plaintiff's counsel stated that his client's claim was limited to $15,000 and, by leave of court and consent of opposing counsel, the prayer of plaintiff's petition was reduced to $15,000. In these circumstances, the amount in dispute is $14,500 and we have appellate jurisdiction. V.A.M.S. § 477.040; Fowler v. Terminal R. Ass'n., Mo., 363 S.W.2d 672, 674-675 (5, 6); Davis v. Hilton, Mo.App., 366 S.W.2d 501(1); Davis v. Ball, Mo.App., 271 S.W.2d 605. See Feste v. Newman, Mo. (banc), 368 S.W.2d 713, 715-716(6, 7); Heuer v. Ulmer, Mo., 273 S.W.2d 169.

The collision under consideration occurred shortly before 3:00 P.M. on Tuesday, December 18, 1962, in Joplin, Missouri, at the intersection of 22nd Street, a paved east-and-west street 34 feet in width, and Sergeant Avenue, a paved north-and-south street 30 feet in width. 22nd Street is designated by ordinance as a "right-of-way street"; and, on the northwest corner of the intersection of 22nd and Sergeant (hereinafter referred to as the intersection), there is a triangular sign bearing the single word "yield," facing toward and directed to southbound traffic on Sergeant. Plaintiff, alone in a 1956 Plymouth two-door sedan, was eastbound on 22nd Street en route to a junior high school to pick up her two daughters and take them to a 3:00 P.M. dental appointment. Defendant, likewise alone in a 1959 Mercury four-door station wagon, was southbound on Sergeant en route to a 3:30 P.M. medical appointment. Both drivers were familiar with the intersection. The weather was good and the pavement was dry.

As is usually the case, plaintiff and defendant (the only two witnesses as to the collision) did not view the occurrence through the same glass. *Plaintiff's* version was that, eastbound at a speed of 15 to 20 miles per hour, she had been "about one or two car lengths from the intersection" (she estimated a car length at 18 feet) when she first had seen defendant's southbound station wagon approaching the intersection at a speed of 20 to 25 miles per hour; that, as the front end of plaintiff's automobile "was going into the intersection," the front end of defendant's station wagon "was about one car length from [north of] the intersection"; that she had continued to watch the station wagon without changing her course or speed—"I had the right-of-way, that's what—I expected her to slow down"; that plaintiff first had recognized that there was danger of a collision "after I got out into the intersection about half a car length . . . I realized she [defendant] wasn't going to stop"; but that it then had been too late for plaintiff to avoid the accident so she had continued forward on the same course and at the same speed to the point of impact in the southeast quadrant of the intersection.

*Defendant's* account was that she had stopped before entering the intersection, "back from the yield sign a little"; that she had looked to her right or to the west and had seen plaintiff's automobile on 22nd Street more than one-half block west of the intersection, eastbound "at a moderate rate of speed, [so] that I could have gotten across [22nd] street"; that she then had looked to her left or to the east and had observed a westbound automobile on 22nd Street more than one-half block from the intersection; that she had started forward, thinking that she had "plenty of time to get across"; but that, as she had moved into the intersection, she had looked to the west again and then had discovered that plaintiff "had speeded up and was approaching the intersection," whereupon defendant had applied the brakes on her station wagon but not in time to avoid the accident.

The front end of defendant's southbound station wagon struck the rear half of the left side of plaintiff's eastbound automobile. As a result of the impact, the rear end of plaintiff's automobile was pushed in a counter-clockwise direction and the automobile came to rest, headed north, with the right rear wheel on the curb at the southeast corner of the intersection. Plaintiff (so she said upon trial) was thrown "against the right-hand door." Defendant's station wagon stopped in the intersection.

Policeman Bottenfield, who investigated the accident, testified that neither driver had claimed any injury. Before she got out of the automobile, plaintiff admittedly told defendant that she did not think that she was injured; but, when she alighted, a small cut and a bruise on one knee were observed. After a passing motorist had driven her home, plaintiff took a taxicab to the office of L. H. McPike, M.D., her "family doctor." Dr. McPike, called as a witness for *defendant*, stated that plaintiff's only complaints on the day of accident were that "she was having pain with both knees and her left leg." He "cleaned up and dressed . . . lacerations of both knees and . . . a little laceration of the left leg" and then directed plaintiff to a radiologist in another building for X-rays of her knees and left leg, the only "involved portions of the anatomy." After the X-rays, she walked six blocks to her home.

Plaintiff made eight visits to the office of Dr. McPike during the period from December 18, 1962, the date of accident, to February 7, 1963. On the second visit, to wit, on December 20, 1962, plaintiff "complained of some soreness in her left wrist." On the sixth visit, to wit, on January 25, 1963, she complained for the first time of "pain in her neck"; but, on the seventh visit, to wit, on February 1, 1963, there was "no pain in neck." On the eighth visit, to wit, on February 7, 1963, Dr. McPike "thought she was well" and dismissed her. Dr. McPike's treatments consisted of "some muscle relaxants and ultrasonic." During the entire period she was under the care of Dr. McPike, plaintiff made no complaint to him about her back—"I had so many other things that I didn't," notwithstanding the fact that (so she insisted upon trial) she had experienced pain in her back continuously during that period of care and subsequently to the time of trial.

After dismissal by Dr. McPike, plaintiff took an undisclosed number of treatments by R. W. Davis, D. C. He was not called as a witness, although plaintiff had talked with him on the day before trial and plaintiff's counsel stated during trial that he was available.

Plaintiff's only medical witness was B. E. DeTar, Jr., M.D., a general surgeon who had examined plaintiff on June 30 and August 5, 1964, but had neither administered nor recommended any treatment. Dr. DeTar found no loss of motion or muscle spasm in plaintiff's back, neck or left knee, although, as "a matter of judgment" grudgingly conceded to have been predicated upon subjective complaints of pain, he did report areas of tenderness in those regions. Plaintiff's counsel here places primary emphasis upon Dr. DeTar's findings of (1) "two little areas of spur formation which is an indication of a form of arthritis" in the lumbar back, at "the fourth lumbar vertebra principally and then the third lumbar vertebra secondarily," and (2) a "very tiny" bit of arthritis between the sixth cervical and seventh cervical vertebrae— so "tiny" that the radiologist did not report it and that Dr. DeTar did not discover it until he was "reviewing these [X-ray] films and getting ready for today." The arthritis found by Dr. DeTar "is the type that is associated either with injury or just ordinary wear and tear and aging of the bones" or, in other words, is either traumatic or developmental. In the doctor's language, "all you can say is, there is a general indication there might have been some trauma that produced that." In answer to a long hypothetical question including (among others) the important assumption that, prior to the accident of December 18, 1962, plaintiff "had never had any pain in her back or

neck . . . and that ever since that date she has been having this pain in her neck, left knee and back, the lower back," Dr. DeTar expressed the opinion that the accident described to him "could result in the conditions I found (sic) at the present time."

On cross-examination, Dr. DeTar said that, if there had been a back injury, he would diagnose it as a lumbosacral sprain; and, with that character of injury, the doctor agreed that there would have been "a wrenching and a tearing . . . and some bleeding into the ligaments" and that "ordinarily" there would have been pain at the time of accident or, if "delayed," within 24 to 48 hours thereafter. Accordingly, Dr. DeTar readily admitted that the assumption that plaintiff had experienced pain in her neck and back continuously since the accident was an "important factor" entering into his above-quoted opinion (i. e., that the accident "could result in the conditions I found at the present time") and that, if plaintiff had not experienced such pain, his opinion would change.

X-rays taken by Dr. DeTar showed a lordosis ("a swayback type of situation") and a "mild" scoliosis ("a side-to-side curve") in plaintiff's lower back, but the doctor had "no evidence one way or the other" on which to base an opinion as to whether or not there had been any change in either of those conditions by reason of the accident. However, he agreed that those conditions could cause pain or discomfort in the back and that they could have accounted for plaintiff's complaint that, *prior to the accident*, "I had had a tired feeling in my back, especially after I would be in bed all night."

■ *Of alleged inadequacy of the verdict.* Under our juridical system, determination of the amount of damages is primarily for the jury.[1] And where, as here, the trial court has denied a new trial for alleged inadequacy, the rule upon appeal is that the jury's exercise of its discretion in the assessment of damages is conclusive unless the verdict is so shockingly inadequate as to indicate that it is the result of passion and prejudice or of a gross abuse of such discretion.[2] We do not weigh the evidence but rather seek only to ascertain whether the trial court abused its discretion in denying a new trial. And our inquiry is whether, viewing the record in the light most favorable to the trial court's ruling on the complaint of inadequacy, it reasonably may be said that the verdict was supported by substantial evidence.[3] In this inquiry, we must bear in mind that the credibility of the witnesses, including the medical experts, and the weight and value to be accorded to their testimony were, in the first instance, matters peculiarly within the province of the jury,[4] in keeping with the fundamental principle that the

1. Spica v. McDonald, Mo., 334 S.W.2d 365, 368(1); Donahoo v. Illinois Term. R. Co., Mo., 300 S.W.2d 461, 469(10); Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 1150, 238 S.W.2d 674, 681(14); Coghlan v. Trumbo, Mo., 179 S.W.2d 705, 706(4); Porter v. Smoot, Mo.App., 375 S.W.2d 209, 212(2).

2. Vogrin v. Forum Cafeterias of America, Mo., 308 S.W.2d 617, 622(5); Thompson v. Healzer Cartage Co., Mo., 287 S.W.2d 791, 792(2); Conner v. Neiswender, 360 Mo. 1074, 1077, 232 S.W.2d 469, 470 (2); Wilhelm v. Kansas City Public Service Co., 358 Mo. 6, 11, 212 S.W.2d 915, 918(5); Coghlan, supra note 1, 179 S.W.2d at 706(2).

3. Miller v. Harner, Mo., 373 S.W.2d 941, 947(2, 3); Mitchell v. Mosher, Mo., 362 S.W.2d 533, 536(2, 3); Spica, supra note 1, 334 S.W.2d at 368(2); Waller v. Oliver, Mo., 296 S.W.2d 44, 49(7, 8); Roush v. Alkire Truck Lines, Mo., 245 S.W.2d 8, 10(2–4); Conner, supra note 2, 360 Mo. at 1077, 232 S.W.2d at 470–471 (3–5); Porter, supra note 1, 375 S.W. 2d at 212(3, 4).

4. Patison v. Campbell, Mo., 337 S.W.2d 72, 75(4); Vogrin, supra note 2, 308 S.W. 2d at 623(7); Combs v. Combs, Mo., 284 S.W.2d 423, 426(6); Roush, supra note 3, 245 S.W.2d at 12(6); Wilhelm, supra note 2, 358 Mo. at 12, 212 S.W.2d at 918; Mickel v. Thompson, 348 Mo. 991, 1003, 156 S.W.2d 721, 728(13).

jury may believe all or none of the testimony of any witness, or may accept it in part and reject it in part, just as it finds the same to be true or false when considered in relation to the other testimony and the facts and circumstances of the case.[5]

The only objective evidences of injury to instant plaintiff were the relatively inconsequential lacerations on her knees and left leg. Her alleged "pain, suffering and difficulties" rested largely upon her own testimony and were in no sense conceded by defendant. Wilhelm v. Kansas City Public Service Co., 358 Mo. 6, 14, 212 S.W.2d 915, 920. There was no evidence of medical or hospital expenses, loss of earnings, or other so-called special damages. Roush v. Alkire Truck Lines, Mo., 245 S.W.2d 8, 11; Wilhelm, supra, 358 Mo. at 14, 212 S.W.2d at 920. Contrast Pinkston v. McClanahan, Mo., 350 S.W.2d 724, 728, 729; Boschert v. Eye, Mo., 349 S.W.2d 64, 66; Hufft v. Kuhn, Mo., 277 S.W.2d 552, 555; Brown v. Moore, Mo., 248 S.W.2d 553, 558–559(9).

The jurors were not required to believe plaintiff's testimony about her alleged "pain, suffering and difficulties" [Wilhelm, supra, 358 Mo. at 14, 212 S.W.2d at 920; Vogrin v. Forum Cafeterias of America, Mo., 308 S.W.2d 617, 623] or to embrace the inconclusive, suppositious opinion testimony of her only medical witness "as to causation [which] was based upon facts related by plaintiff which the jury could accept or reject." Roush, supra, 245 S.W.2d at 12. See Hemminghaus v. Ferguson, 358 Mo. 476, 487, 215 S.W.2d 481, 486 (6). That plaintiff admittedly made no complaint to Dr. McPike about her back, although upon trial she insisted that her back had pained her continuously while she was under his care, well might have been considered by the triers of the facts as particularly meaningful and significant [compare Porter v. Smoot, Mo.App., 375 S.W.2d 209, 213–214], and plaintiff's own

medical evidence fairly might have been regarded by them as not persuasive of any serious or permanent injury. Davidson v. Schneider, Mo., 349 S.W.2d 908, 912.

From all of the foregoing, it is to us clearly apparent that the jurors rationally and reasonably could have concluded that any injury sustained by plaintiff as a result of the accident was trivial or not serious in "its end result" [Davidson, supra, 349 S.W.2d at 912; Conner v. Neiswender, 360 Mo. 1074, 1079, 232 S.W.2d 469, 472—see Roush, supra, 245 S.W.2d at 11(5); Grayson v. Pellmounter, Mo. App., 308 S.W.2d 311, 314(3)], and that the verdict for $500 reflects a justifiable view of the evidence considered from the standpoint favorable to the verdict. Polizzi v. Nedrow, Mo., 247 S.W.2d 809, 812; Wilhelm, supra, 358 Mo. at 15, 212 S.W.2d at 920. It necessarily follows that we may not convict the trial court of an abuse of discretion in approving the verdict [Mitchell, supra, 362 S.W.2d at 537; Coghlan v. Trumbo, Mo., 179 S.W.2d 705, 707(8, 9)], and that plaintiff's point on appeal that the verdict "was so grossly inadequate as to indicate bias and prejudice of the jury" must be denied.

In Artstein v. Pallo, Mo. (banc), 388 S. W.2d 877, upon which instant plaintiff primarily relies, "[t]he parties [agreed] that, if the plaintiff [was] entitled to recover at all, the award of [$500] damages [was] grossly inadequate" [388 S.W.2d at 882], and the meritorious question on appeal was whether or not the new trial *granted* by the trial court should have been limited to the issue of damages only. Obviously, the instant situation affords no basis for application of the holding in Artstein, supra.

*Of newly-discovered evidence.* Plaintiff's second assignment is that the trial court "abused his discretion in refusing to grant plaintiff a new trial on the ground

---

5. Baker v. Brown's Estate, 365 Mo. 1159, 1165, 294 S.W.2d 22, 27(13); Patison, supra note 4, 337 S.W.2d at 75(4); Wil-liams v. Ricklemann, Mo., 292 S.W.2d 276, 280(5); Hutchison v. Thompson, Mo., 175 S.W.2d 903, 911.

of newly-discovered evidence of X-rays taken after the date of the collision and not available to plaintiff through no lack of diligence of plaintiff's counsel . . ." This refers to two X-rays of plaintiff's lumbar spine alleged to have been taken by Dr. Davis, the chiropractor, on February 5 and 20, 1963. The material allegations of plaintiff's motion for new trial and of the supporting affidavits of plaintiff's counsel and Dr. Davis, all timely filed on November 27, 1964, fifteen days after entry of judgment [V.A.M.R. Rule 78.02], are digested below.

*Plaintiff's counsel* averred "that previous to the trial on numerous occasions he had questioned R. W. Davis, D. C. . . . and had been told that they [the X-rays] were not available and could not be located and only on November 25, 1964 were said X-rays located, the same having been misfiled as shown by Dr. Davis' attached affidavit and that diligent search had been made for said X-rays on many occasions prior to the trial," and that the X-rays were "not cumulative evidence only but [were] strongly corroborative evidence and proof positive that plaintiff's lumbar spine was injured and damaged as a result of the collision." *Dr. Davis* stated in his affidavit that he had told both plaintiff's counsel and defendant's counsel prior to the trial that the X-rays had been made; that affiant "had searched for these X-rays on numerous occasions at the request of [plaintiff's counsel] and had been unable to locate them because they had been misfiled under the name of another patient"; that "within the last few days affiant has located and reviewed these X-rays and in his opinion . . . [they] show that there was a development of arthritis on one or more of the lumbar vertebrae, the most noticeable arthritic development [being] upon the 3rd and 4th lumbar vertebrae"; and that "affiant believes that these X-rays are competent evidence to show that the arthritis that developed in [plaintiff's] lumbar spine was of traumatic origin or grossly aggravated by trauma when compared

with . . . an X-ray made at DeTar Clinic . . . on June 30, 1964" received in evidence as plaintiff's exhibit 13. *No affidavit of Dr. DeTar was filed.*

On December 7, 1964, *defendant* timely filed the opposing affidavit of her counsel [V.A.M.R. Rule 78.03; V.A.M.S. § 510.350], in which he affirmed that "when affiant interviewed Dr. Davis . . . on November 10, 1964, . . . for the purpose of locating and inspecting Dr. Davis' X-rays of the plaintiff, Dr. Davis stated that he had turned over [plaintiff's] X-rays to her attorney and that he (Dr. Davis) did not have them"; that "Dr. Davis had previously reported to plaintiff's then attorney, Max Glover of Webb City, that plaintiff's condition had been treated and corrected, that she would not have any more trouble and she was physically in good condition," as shown by Dr. Davis' letter of April 29, 1963, copied verbatim in the affidavit; and that, when "affiant called on Dr. Davis at his office on December 1, 1964, . . . Dr. Davis refused to discuss the matter with affiant and said that he would have to be subpoenaed before he would talk." In his letter of April 29, 1963, to attorney Glover, Dr. Davis had written that plaintiff "returned to the office for further treatment, on April 9, 1963," complaining "of her neck giving her more trouble"; that "upon examination I found some tension and muscular constriction at the level of the 6th and 7th cervical vertebrae"; that "this condition has been treated and corrected, and I do not think we will have any more trouble"; and that "*on her last visit to my office I talked with [plaintiff] in regard to her condition and I feel certain that she is physically in good condition.*" (Emphasis ours.) *Plaintiff tendered no reply affidavit.*

Motions for new trials on the ground of newly-discovered evidence are entertained reluctantly [Lindhorst v. Curtis Mfg. Co., Mo.App., 105 S.W.2d 972, 976 (10) ], examined cautiously [Arnold v. May Department Stores Co., 337 Mo. 727,

740, 85 S.W.2d 748, 756(14) ], and construed strictly. Cook v. St. Louis & Keokuk R. Co., 56 Mo. 380, 382; Gerth v. Christy, Mo.App., 231 S.W. 639, 640. For courts ever have been mindful not only "of the temptation to parties smarting under defeat to make them, and . . . of the facility with which plausible grounds are manufactured" [State v. McLaughlin, 27 Mo. 111, 112—see Lindhorst, supra, 105 S.W.2d at 977] but also of the fact that, "if the discovery of new, material evidence alone would be ground for new trial, there would be no end to litigation" [Mayor, Etc., of Town of Liberty v. Burns, 114 Mo. 426, 433, 19 S.W. 1107, 1109; Young v. St. Louis Public Service Co., Mo., 326 S.W.2d 107, 113] whereas public policy requires that "litigation sometime end." Curry v. Thompson, Mo., 247 S.W.2d 792, 799, 31 A.L.R.2d 1225. So it is that our appellate courts repeatedly have said that such motions are to be tolerated, but not encouraged; viewed with aversion, rather than with favor; and granted as an exception, but refused as a rule.[6]

 A new trial should not be awarded on the ground of newly-discovered evidence unless the moving party first satisfies the following prerequisites (to which we hereinafter sometimes refer by number) by showing (1) that the evidence has come to his knowledge since the trial, (2) that his failure to learn of such evidence sooner was not due to want of diligence, (3) that such evidence is so material that it probably would produce a different result if the new trial were granted, (4) that it is not cumulative only, (5) that the object of the testimony is not merely to impeach the character or credit of a witness, and (6) that the affidavit of the witness himself is produced or its absence accounted for.[7] The ruling of an after-trial request predicated on newly-discovered evidence rests largely in the sound discretion of the trial court;[8] and, unless there has been a clear abuse of that discretion, the appellate court will not interfere.[9] Any doubt as to whether the trial court's discretion has been exercised soundly in a given situation must be resolved in favor of the ruling made.[10]

Passing the inferences which might be drawn from the affirmation in the affidavit of defendant's counsel that, when interviewed on November 10, 1964, two days prior to trial, "Dr. Davis stated that he had

6. Cook v. St. Louis & Keokuk R. Co., 56 Mo. 380, 382; McClellan v. Kansas City Public Service Co., Mo.App., 19 S.W.2d 902, 908(6); Lewis v. McClellan, Mo.App., 1 S.W.2d 247, 250(5); Gerth v. Christy, Mo.App., 231 S.W. 639, 640; E———— v. G————, Mo.App., 317 S.W.2d 462, 468–469(5). See Devine v. Wells, 300 Mo. 177, 185, 254 S.W. 65, 67(1); Gromowsky v. Ingersol, Mo.App., 241 S.W.2d 60, 64(8); In re Priest's Estate, Mo.App., 227 S.W.2d 474, 478(5).

7. Holt v. Queen City Loan & Investment, Inc., Mo., 377 S.W.2d 393, 402; Womack v. McCullough, Mo., 358 S.W.2d 66, 68; Young v. St. Louis Public Service Co., Mo., 326 S.W.2d 107, 111(5); Lynch v. Baldwin, Mo., 117 S.W.2d 273, 276 (9); Grubbs v. Kansas City Public Service Co., 329 Mo. 390, 405, 45 S.W.2d 71, 78; Devine, supra note 6, 300 Mo. at 187–188, 254 S.W. at 68; State v. McLaughlin, 27 Mo. 111, 112; State v. Page, Mo.App., 192 S.W.2d 577, 579(10); Browhaw v. Dowd, Mo.App., 187 S.W.2d 29, 30 (1).

8. Davis v. Illinois Term. R. Co., Mo., 326 S.W.2d 78, 86–87; Arnold v. May Department Stores Co., 337 Mo. 727, 740, 85 S.W.2d 748, 756(13); In re Priest's Estate, supra note 6, 227 S.W. 2d at 478(6); Lindhorst v. Curtis Mfg. Co., Mo.App., 105 S.W.2d 972, 977.

9. Womack, supra note 7, 358 S.W.2d at 68; Fidelity & Cas. Co. of N. Y. v. Western Cas. & Sur. Co., Mo.App., 337 S.W.2d 566, 574(5); Pippas v. Pippas, Mo.App., 330 S.W.2d 132, 138(12); Deacon v. City of Ladue, Mo.App., 294 S.W. 2d 616, 626(13); I———— v. B————, Mo. App., 305 S.W.2d 713, 721(10); Citizens Bank of Senath v. Johnson, Mo.App., 112 S.W.2d 916, 921(12); Galeener v. Derris, Mo.App., 20 S.W.2d 167, 169(3).

10. Cook, supra note 6, 56 Mo. at 384; McKnight v. Batrick, Mo.App., 49 S.W.2d 277, 281; Galeener, supra note 9, 20 S.W. 2d at 169; McClellan, supra note 6, 19 S.W.2d at 908(9); Lewis, supra note 6, 1 S.W.2d at 251(8).

turned over [plaintiff's] X-rays to her attorney," we are of the opinion that the trial court reasonably might have concluded that plaintiff had failed to make a satisfactory showing of several of the six prerequisites to the granting of a new trial for newly-discovered evidence. *Prerequisites 1 and 2* The affidavits of plaintiff's counsel and Dr. Davis were to the effect that the X-rays under discussion "could not be located" prior to trial; but, if counsel then had regarded them as material, no doubt the "misfiled" X-rays could have been located before trial in the same manner they were found after trial. The trial court would have been justified in finding that plaintiff had not made a satisfactory showing that failure to produce the X-rays at the trial was not due to want of diligence.[11]

*Prerequisites 4 and 5.* To some extent, the X-rays fairly might have been regarded by the trial court as both *cumulative* and *impeaching,* those being "at least in part fact questions." Womack v. McCullough, Mo., 358 S.W.2d 66, 69(7). Plaintiff's counsel treats of the X-rays as being *cumulative* or, cloaking the same thought in different nomenclature, "strongly corroborative," for it is argued in plaintiff's brief that "this arthritic condition [at the third and fourth lumbar vertebrae] had developed and was definitely found by Dr. DeTar" and "the early development of the arthritis about two months after the accident confirms Dr. DeTar's findings and opinion that the accident was the cause of the

traumatic arthritis." But from another viewpoint, the X-rays would tend to *impeach* Dr. DeTar in that, if offered to demonstrate the alleged traumatic causation of the arthritic condition, they would run counter to the testimony of Dr. DeTar who, when asked whether an X-ray taken "maybe just a month or so after the accident" would show the arthritic "spur formation," answered "not necessarily, no, it probably would not." In this connection, we note that plaintiff's trial theory was that the accident of December 18, 1962, had *caused* an arthritic condition, *not* that it had *aggravated* a pre-existing arthritic condition.

*Prerequisite 3.* Having in mind all of the foregoing and, importantly, Dr. Davis' letter of April 29, 1963, to plaintiff's then attorney, which closed with the assurance that "I feel certain that she [plaintiff] is physically in good condition," the trial court reasonably might have believed that plaintiff had failed to satisfy the third prerequisite by showing that the proffered X-rays were so material that they probably would produce a different result upon another trial.[12] We cannot find an abuse of discretion on the part of the trial court in its refusal to grant a new trial for newly-discovered evidence.

*Of alleged error in giving defendant's instructions 8, 9 and 10.* Aside from the fact that none of these instructions were set forth in plaintiff's brief, as is plainly required by V.A.M.R. Rule 83.05(a), for which failure this point properly might

11. Holt, supra note 7, 377 S.W.2d at 402; Womack, supra note 7, 358 S.W.2d at 70 (8); Young, supra note 7, 326 S.W.2d at 111–113(6); In re Priest's Estate, supra note 6, 227 S.W.2d at 478(4); McClellan, supra note 6, 19 S.W.2d at 906–907.

12. Curry v. Thompson, Mo., 247 S.W.2d 792, 798–799(3–5), 31 A.L.R.2d 1225; McClellan, supra note 6, 19 S.W.2d at 907 (5); Galeener, supra note 9, 20 S.W.2d

at 169(2); Citizens Bank of Senath, supra note 9, 112 S.W.2d at 921(10); Lewis, supra note 6, 1 S.W.2d at 251(9). See Holt, supra note 7, 377 S.W.2d at 402; Davis, supra note 8, 326 S.W.2d at 86–87(10); Gaty v. United Rys. Co. of St. Louis, 286 Mo. 503, 517–519, 227 S.W. 1041, 1045(1, 2); Tamko Asphalt Products, Inc. v. Fenix, Mo.App., 321 S.W.2d 527, 536(15); Fischman v. Schultz, Mo.App., 55 S.W.2d 313, 319(9).

be disregarded,[13] plaintiff is in no position to complain here about these instructions because they in no wise related to the issue of damages but dealt only with submission of the issue of liability, on which the jury found for plaintiff anyway. In

these circumstances, the giving of the assailed instructions could not constitute reversible error.[14]

The judgment should be and is affirmed.

RUARK, P. J., and HOGAN, J., concur.

13. Brown v. Thomas, Mo.App., 316 S.W. 2d 234, 237(9); Bartlett v. Hume-Sinclair Coal Mining Co., Mo.App., 351 S.W.2d 214, 217(5); Smith v. Aldridge, Mo.App., 356 S.W.2d 532, 539; State ex rel. State Highway Com'n. v. Warner, Mo.App., 361 S.W.2d 159, 165(11).

14. Cochran v. Wilson, 287 Mo. 210, 228, 229 S.W. 1050, 1056(5); Craton v. Huntzinger, Mo., 187 S.W. 48, 53(8); State ex rel. State Highway Com'n. v. Southern Securities Co., Mo.App., 60 S.W.2d 632, 635(9); Broughton v. S. S. Kresge Co., Mo.App., 26 S.W.2d 838, 840(6); Edwards v. Missouri Pacific Ry. Co., 82 Mo.App. 478, 482–483(2). See Kelly v. Columbia Box Co., Mo., 248 S.W. 589, 591(4).